UNITED STATES of America, Plaintiff–Appellant,

v.

The BONANNO ORGANIZED CRIME FAMILY OF LA COSA NOSTRA, Joseph Bonanno, Philip Rastelli, Joseph Massino, Anthony Spero, Louis Attanasio, Alfred Embarrato, Gabriel Infanti, Frank Lino, Nicholas Marangello, Anthony Reila, Michael Sabella, Anthony Graziano, Benjamin Ruggiero, Ignatius Bracco, James Vincent Bracco, William Rodini, Vito Gentile, International Brotherhood of Teamsters Local 814 Van Drivers, Packers and Furniture Handlers, Warehousemen's and Appliance Home Delivery Union, Executive Board of International Brotherhood of Teamsters Local 814 Van Drivers, Packers and Furniture Handlers, Warehousemen's and Appliance Home Delivery Union, International Brotherhood of Teamsters Local 814 Van Drivers, Packers and Furniture Handlers, Warehousemen's and Appliance Home Delivery Union Welfare Fund, International Brotherhood of Teamsters Local 814 Van Drivers, Packers and Furniture Handlers, Warehousemen's and Appliance Home Delivery Union Pension Fund, International Brotherhood of Teamsters Local 814 Van Drivers, Packers and Furniture Handlers, Warehousemen's and Appliance Home Delivery Union Annuity Fund, Defendants–Appellees.

No. 903, Docket 88–6289.

United States Court of Appeals, Second Circuit.

Argued March 13, 1989.
Decided June 23, 1989.

Peter R. Ginsberg, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Robert L. Begleiter, Thomas A. Carr, Asst. U.S. Attys., E.D. N.Y., Brooklyn, N.Y., of counsel), for plaintiff-appellant.

Michael J. Coyle, New York City (Stanley A. Teitler, New York City, of counsel), for defendant-appellee Rastelli.

Before MESKILL and NEWMAN, Circuit Judges, and KENNETH CONBOY, District Judge for the Southern District of New York (sitting by designation).

CONBOY, District Judge:

The United States filed the original complaint in this action on August 25, 1987 against "the Bonanno Organized Crime Family of La Cosa Nostra" ("the Bonanno Family"), Local 814 of the Van Drivers, Packers and Furniture Handlers, Warehousemen's and Home Delivery Union, and numerous individuals. An amended complaint was filed in October of 1987. The amended complaint contained fourteen separately denominated claims for relief, thirteen of which were predicated on violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982 and Supp. VI 1987). The remaining claim was *in rem* against certain properties allegedly used by the defendants in connection with violations of 18 U.S.C. § 1955 (1982 & Supp. V 1987), which essentially prohibits all forms of participation in the conduct of illegal gambling businesses. The government sought extensive injunctive relief pursuant to Section 1964(a), an award of treble damages pursuant to Section 1964(c), and forfeiture of the properties identified in the Section 1955 claim. In response to a number of motions attacking the pleadings, the District Court for the Eastern District of New York (I. Leo Glasser, Judge) ruled, *inter alia*, that the federal government lacks standing to sue under 18 U.S.C. § 1964(c) and that the Bonanno Family is not a "person" within the meaning of RICO and thus not a proper RICO defendant. *United States v. Bonanno Organized Crime Family*, 683 F.Supp. 1411 (E.D.N.Y.1988). On the basis of these two rulings, which are the subject of this appeal, the District Court dismissed all claims against the Bonanno Organized Crime Family and all monetary damage claims based on RICO, and directed entry of judgment pursuant to Fed.R.Civ.P. 54(b).

I. Is the United States a "person" entitled to sue under Section 1964(c)?

As always, in executing our overarching obligation to give effect to congressional intent, *Blackfeet Tribe of Indians v. Montana*, 729 F.2d 1192 (9th Cir. 1984), *aff'd*, 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985), "consideration must first be given to the language of the statute," *Netherlands Shipmortgage Corp. v.*

*Madias,* 717 F.2d 731, 732 (2d Cir.1983), and if the language is clear and unambiguous it must ordinarily be regarded as conclusive. *Sierra Club v. U.S. Army Corps of Engineers,* 732 F.2d 253, 258 (2d Cir. 1984). *But see Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981) (plain-meaning rule does not preclude consideration of persuasive extrinsic evidence if it exists); *Shippers Nat'l Freight Claim Council, Inc. v. Interstate Commerce Comm'n,* 712 F.2d 740, 747 (2d Cir.1983) ("Mere incantation of the plain meaning rule ... cannot substitute for meaningful analysis."), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3534, 82 L.Ed.2d 839 (1984). The plain-meaning rule, however, is easier stated than applied, since " 'whether ... the words of a statute are clear is itself not always clear.' " 2A *Sutherland Statutory Construction* § 46.04, at 86 (4th ed. 1984) (quoting *Barbee v. United States,* 392 F.2d 532 (5th Cir.), *cert. denied,* 391 U.S. 935, 88 S.Ct. 1849, 20 L.Ed.2d 855 (1968)).

What the government heralds as the plain and obvious meaning of the relevant statutory text is in fact arrived at by a relatively involved, and selective, process of deduction. Section 1964(c) provides as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

"Person" is in turn defined to include "any individual or entity capable of holding a legal or beneficial interest in property." Section 1961(3). Sidestepping the question of whether the rather amorphous term "entity" plainly and ordinarily encompasses the United States,[1] the government main-tains that it has standing to sue under Section 1964(c) because the United States is capable of holding a legal or beneficial interest in property. Whatever else might be said about this conclusion—that it is arguable or reasonable—it does not follow from the plain language of the statute. If the government's standing under Section 1964(c) is "plain," one would be at a loss for adjectives to describe the manner in which Congress ordinarily expresses its intention to render a statutory provision applicable to the United States: by explicit reference to the United States in the operative language of the statute or by explicit inclusion of the United States in the statutory definition of the object or objects affected by the law. *See General Accounting Office v. General Accounting Office Personnel Appeals Bd.,* 698 F.2d 516, 524 (D.C.Cir.1983). To see examples, we need look no further than RICO itself, *see* Section 1963, nor for that matter beyond the subsections immediately preceding and following 1964(c), *see* Section 1964(b) ("The Attorney General may institute proceedings under this section.") and Section 1964(d) (final judgment in criminal proceeding estops defendant from denying essential elements of the crime "in any subsequent civil proceeding brought by the United States").

The argument against inclusion of the United States is strengthened in this case by the effective breadth of the ruling urged by the government. The government brings to bear an arsenal of statutory-construction principles on the question of whether it has standing to sue for treble damages under Section 1964(c), but the answer turns in large measure on the more general question of whether the United States is a "person" as that term is defined in 1961(3). Under RICO, "a 'person' can sue or be sued, and the statute does not distinguish between the definition of a po-

---

1. The Fifth Edition of Black's Law Dictionary defines "entity" as

   [a] real being; existence. An organization or being that possesses separate existence for tax purposes. Examples would be corporations, partnerships, estates trusts....

   ....

   An existence apart, such as a corporation in relation to its stockholders.

   The dictionary also sets forth Section 101(14) of the Bankruptcy Act which, unlike RICO, defines the word "entity," as it is used in Title 11, and expressly lists a "governmental unit" as an example.

tential plaintiff and defendant." Brief for the Appellant at 17. The disadvantage of being a "person" within the meaning of RICO is that it subjects qualifying entities to the powerful and expansive criminal and civil liability provisions of the Act. Whether the government has standing to sue and whether it has waived its sovereign immunity may, in the abstract, be different questions, but in this case the answer to one is apparently the answer to both. *See Firestone v. Howerton*, 671 F.2d 317, 320 n. 6 (9th Cir.1982) (when same terms are used in different sections of statute, they receive the same meaning); 2A *Sutherland Statutory Construction*, § 47.07, at 133 (4th ed. 1984) ("Legislative declaration of the meaning that a term shall have … is binding, so long as the prescribed meaning is not so discordant to common usage as to generate confusion.").

It is elementary that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued …, and the terms of its consent to be sued in any court define the court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769–770, 85 L.Ed. 1058 (1941). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969).

*United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Thus, our analysis must be informed by the following question: Do the relevant sources of congressional intent on the meaning of Section 1964(c), separately or collectively, evince an unequivocal expression of congressional intent to expose the government to RICO liability? That the United States is capable of owning property and is, perhaps, an "entity" is no better than ambiguous evidence on this issue since

[s]tatutory provisions which are written in such general language as to make

them reasonably susceptible to being construed as applicable both to the government and to private parties are subject to a rule of construction which exempts the government from their operation in the absence of other particular indicia supporting a contrary result in particular instances.

3 *Sutherland Statutory Construction*, § 62.01, at 111 (4th ed. 1986).

Guided by these principles, the Supreme Court, in *United States v. Cooper Corporation*, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941), held that the United States could not maintain an action for treble damages under Section 7 of the Sherman Act, the nearly identical prototype for RICO's civil damage provision:

Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor … and shall recover three fold the damages by him sustained….

*Id.* at 604, 61 S.Ct. at 743. Disclaiming reliance on a "hard and fast rule of exclusion," *id.* at 604–05, 61 S.Ct. at 743,[2] the Court nonetheless concluded that the phrase "any person" does not authorize actions by the government because " 'the ordinary dignities of speech would have led' to [the government's] mention by name" had Congress so intended, *id.* at 606, 61 S.Ct. at 744 (quoting *Davis v. Pringle*, 268 U.S. 315, 318, 45 S.Ct. 549, 550, 69 L.Ed. 974 (1925)). And, the Court further observed, unless Congress used the term "person" in two different senses in the same sentence, Section 7, which authorized a "person" to sue any "person" who violated the Act, would have exposed the United States to liability for treble damages. *Id.* The Court's reasoning in *Cooper* applies with equal force here. It is therefore fair to say that the primary source of congressional intent—the language of the section

---

**2.** "The purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids to construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law." *Id.* at 605, 61 S.Ct. at 743–44.

under consideration—does not support the government's position.

In ascertaining the proper construction of a specific statutory provision, it is also appropriate and helpful to view the disputed language in context; that is, to interpret the specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part. *See* 2A *Sutherland Statutory Construction*, § 46.05 (4th ed. 1984). The Court in *Cooper* observed that the first three sections of the Sherman Act imposed criminal liability for antitrust violations and that Section 4, 15 U.S.C. § 4, explicitly granted the United States authority to seek injunctions against such violations. Only Section 7 provided an action to "persons" injured in their business or proprietary capacity. This dual structure, the Court found, evinced clear congressional intent to authorize "two classes of actions,—those made available only to the Government, which are first provided in detail, and, in addition, a right of action for treble damages granted to redress private injury." *Id.* at 608, 61 S.Ct. at 745. The same can be said about RICO. In addition to authorizing criminal prosecutions by the government, with broad ancillary powers, *see* Section 1963(b), the treble damage provision at issue here is, as already noted, nestled between two subsections that explicitly refer to the United States and delineate its powers on the civil side of RICO.

Despite the manifest and undeniable significance of the Clayton Act as a model for the structure and language of RICO, *Agency Holding Corp. v. Malley–Duff & Associates*, 483 U.S. 143, 151, 107 S.Ct. 2759, 2764, 97 L.Ed.2d 121 (1987); *Sedima, S.P. R.L. v. Imrex Co.*, 473 U.S. 479, 489, 105 S.Ct. 3275, 3282, 87 L.Ed.2d 346 (1985); *see also* 116 Cong.Rec. 35295 (1970) ("Title IX represents, in large measure, an adaptation of the machinery used in the antitrust field to redress violations of the Sherman

Act and other antitrust legislation) (Statement of Rep. Poff), the government suggests that antitrust cases like *Cooper*[3] are of little value in construing Section 1964(c) because Congress clearly intended "not to burden RICO with" precedent under those laws. This position is inaccurate and in some respects irrelevant.

First, even if the structural and textual similarities between RICO and the antitrust laws were purely coincidental, it would not mean that the *Cooper* decision, which applied general rules of statutory construction and common sense to a parallel issue, is not a persuasive precedent. As in *Cooper*, the language and structure of the statute at issue, and the consequences of the interpretation urged by the government, all point to a reading of a civil liability provision that excludes actions by the United States.

Second, what the government presents as a sweeping congressional admonition against reliance on antitrust precedents is a much more limited expression of policy against saddling RICO with restrictive rulings born of the theoretical underpinnings of the antitrust laws; specifically, limitations on standing and strict causation requirements tied to notions of economic competition. *See, e.g., Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (because antitrust laws were enacted to protect competition and not competitors, Clayton Act plaintiff must prove injury that reflects anti-competitive effect either of violation or of anti-competitive acts made possible thereby). Thus could the Supreme Court in *Sedima* reject, as a prerequisite to maintaining an action, a "racketeering injury"—until then read into RICO by some courts analogizing to the "competitive injury" requirement in antitrust cases—because it was a precedent " 'appropriate in a purely antitrust context,' " 473 U.S. at 498, 105 S.Ct. at 3286 (quoting 115 Cong.Rec. 6995 (1969)), and then decide, less than two

---

**3.** In 1914, Section 7 of the Sherman Act was superseded, without significant change, by Section 4 of the Clayton Act. Section 7 was eventually repealed in 1955 since it was essentially superfluous. *See Pfizer, Inc. v. Gov't of India,* 434 U.S. 308, 311 & n. 8, 98 S.Ct. 584, 587 & n. 8, 54 L.Ed.2d 563 (1978); *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 264 n. 15, 92 S.Ct. 885, 892 n. 15, 31 L.Ed.2d 184 (1972).

years later in *Agency Holding Corp.*, that the four-year statute of limitations applicable to the Clayton Act applied to RICO in part because of "the similarities in purpose and structure between RICO and the Clayton Act [and] the clear legislative intent to pattern RICO's civil enforcement provision on the Clayton Act," 483 U.S. at 152, 107 S.Ct. at 2765. These cases demonstrate that Congress' desire to prevent the grafting onto RICO of substantive concepts intrinsic to antitrust in no way diminishes the inferences to be drawn from the intentional structural and textual similarities between RICO and the Clayton Act.

To the contrary, it is generally presumed that Congress is (a) knowledgeable about existing laws pertinent to later-enacted legislation, *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 108 S.Ct. 1704, 1711–12, 100 L.Ed.2d 158 (1988), (b) aware of judicial interpretations given to sections of an old law incorporated into a new one, *St. Regis Mohawk Tribe v. Brock,* 769 F.2d 37 (2d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986), and (c) familiar with previous interpretations of specific statutory language, *Blitz v. Donovan,* 740 F.2d 1241, 1245 (D.C.Cir.1984). If the standing provisions of the antitrust laws have not precisely been incorporated into RICO, they are, at a minimum, pertinent to the Act and contain, in certain respects, identical language.

In advancing several specific arguments to support its claim, the government fails to acknowledge the existence, let alone the significance, of germane antitrust precedents. For example, the proposition is advanced that the United States should be on at least an equal footing with the states and their subdivisions, which have been held to be "persons" under RICO. *See, e.g., Alcorn County v. U.S. Interstate Supplies, Inc.,* 731 F.2d 1160 (5th Cir. 1984); *Pennsylvania v. Cianfrani,* 600 F.Supp. 1364 (E.D.Pa.1985). But the government fails to discuss the importance of *Georgia v. Evans,* 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942), where the Court held that a state is a "person" for antitrust purposes largely because any other ruling would completely deprive states of

redress against violators, *unlike the United States* which had several exclusive remedies and powers provided for it under the Sherman Act. *Id.* at 161–62, 62 S.Ct. at 973–74. The government also maintains that the use of the word "includes" before the examples in the definition of "person" summons us to read the definition as embracing the United States. The Sherman Act, however, contained a similar, ostensibly open-ended, definition of "person":

> "the word 'person' or 'persons' wherever used in this act ... shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country."

*Cooper,* 312 U.S. at 607, 61 S.Ct. at 745. From the very fact of "this sweeping inclusion of various entities," *id.,* the Court reasoned "that if the United States was intended to be included Congress would have so provided expressly," *id.* While we should be reluctant to conclude that Congress intended nothing by departing from the definition of "person" in the Sherman Act, it is simply impossible to tell exactly what consequences were expected by the changes made in Section 1961(3). Given the canons of statutory construction we have already discussed, we will certainly not presume that Congress expressed its intention to avoid the interpretation given the Sherman Act by so nebulous and oblique a change in phraseology.

Fourteen years after the Supreme Court in *Cooper* declined to read Section 7 of the Sherman Act as granting the United States a right to seek treble damages, Congress amended the Clayton Act by adding a separate provision explicitly authorizing the United States to seek recovery of actual damages for violations of the antitrust laws:

> Whenever the United States is hereafter injured in its business or property by reason of anything forbidden in the antitrust laws it may sue therefor in the United States district court for the district in which the defendant resides or is found or has an agent, without respect to

the amount in controversy, and shall recover actual damages by it sustained and the cost of suit.

Section 4A, 15 U.S.C. § 15a. Whether viewed as a departure from the structure of the antitrust laws as they existed after 1955, or as a conformation to their framework as they existed before, the omission of an express provision for damage actions by the government in RICO must be viewed as informed and intentional. To say, as does the government, that Congress might simply have "opted in RICO not to distinguish between sovereign and non-sovereign litigants" is illogical and completely contrary to the above-mentioned judicial presumptions. It is also inimical to direct and explicit evidence in the legislative record of Congress' understanding of Section 1964(c).

An earlier version of RICO passed by the Senate, S. 1861, 91st Cong., 1st Sess., 115 Cong.Rec. 9951 (1969), did not include a provision for private damage actions. At the suggestion of Representative Steiger and the American Bar Association, subsection (c) of 1964 was added to the Senate bill so "that *private* persons injured by reason of a violation of the title may recover treble damages in federal courts." 116 Cong.Rec. 35,295 (1970) (statement of Rep. Poff) (emphasis added).[4] The House version of the bill, which included other amendments in addition to the treble damage provision, was passed without comment on the expanded scope of Section 1964. Representatives Steiger and Poffs' understanding of the new provision is echoed in the House Judiciary Committee Report's preliminary description of the main features of the Organized Crime Control Act of 1970: "The title, as amended, also authorizes civil treble damage suits on the part of *private* parties who are injured." H.R.Rep. No. 1549, 91st Cong., 2d Sess. 57, *reprinted in* 1970 U.S.Code Cong. & Admin.News 4007, 4010 (emphasis added) (hereinafter "House Report").

The apparent lack of any provision for damage actions by the government prompted Representative Steiger to propose an amendment to RICO similar to Section 4A of the Clayton Act. *See* 116 Cong.Rec. 27,739; *see also id.* at 35,227–28 (1970) ("title IX fails to provide ... compensatory damages to the United States when it is injured in its business or property ...") (statement of Rep. Steiger). The amendment was eventually withdrawn not because it was thought to be superfluous but because it had not been considered by the Judiciary Committee. 116 Cong.Rec. 35,-346–47 (1970).

Apart from comments in the Congressional Record expressing concern that RICO not be hampered by principles "appropriate in a purely antitrust context," 115 Cong.Rec. 6995 (1969), the only portion of the legislative history offered by the government on the intended scope of the treble damages provision is a sentence quoted from the Senate Judiciary Committee Report, supposedly to the effect that the enumerated remedies in Section 1964 are not exclusive. The sentence, however, is taken out of context in a way that materially distorts its meaning. The Senate Report reads in relevant part as follows:

> *Subsection (a)* contains broad remedial provisions for reform of corrupted organizations. Although certain remedies are set out, the list is not exhaustive....

S.Rep. No. 617, 91st Cong., 1st Sess. 160 (1969) (emphasis added); *accord* House Report at 4034. The lack of a similar invitation to expand the remedies beyond those expressly enumerated in subsection (c) gives rise to the inference that Congress was not as sanguine about free-wheeling judicial expansion of the potent treble-damage remedy under the Act. It is evident, therefore, that the legislative history is, without significant exception, stronger and more direct than the text of the Act in its support of an interpretation of "person" that excludes the United States.

---

**4.** Representative Steiger envisioned "a *private* civil damage remedy ... similar to the private damage remedy found in the anti-trust laws." *Organized Crime Control: Hearings on S. 30 and* *Related Proposals Before Subcomm. No. 5 of the House Comm. on the Judiciary,* 91st Cong., 2d Sess. 520 (1970) (emphasis added).

We are left then to consider the congressional mandate to read the provisions of RICO broadly to advance its remedial purposes, P.L. 91–452, § 904(a), 84 Stat. 947, which, the government argues, compels us to resolve any ambiguity in the statutory text and legislative history on this question in favor of inclusion. The short answer to this argument is that "a legislative mandate to apply a liberal interpretation to an act will not justify the judicial creation of right or liabilities under the guise of 'construction.'" 2A *Sutherland Statutory Construction*, § 58.05, at 722 (4th ed. 1984). To give RICO the construction requested by the government in the face of the language, structure, and legislative history of the Act, the inferences and presumptions to be drawn from Congress' intentional use of the Clayton Act as a model, and the strong judicial presumption against waivers of sovereign immunity, would not be liberal construction but liberal re-writing of the statute. Nor could the incremental increase in the government's already broad and potent powers under the Act, when weighed against the havoc that would be wreaked by this Court even raising the prospect of governmental exposure to RICO liability, be fairly deemed to be an effectuation of the Act's remedial purposes.

We accordingly conclude that Congress did not intend to authorize treble damage actions by the United States pursuant to 1964(c).

## II. Is the Bonanno Family a "person" Subject to Suit Under RICO?

Although we can envision serious practical and perhaps constitutional difficulties arising out of lawsuits against crime syndicates, we can assume, without deciding, that an organization with the alleged attributes of the Bonanno Family is subject to suit under Fed.R.Civ.P. 17(b)(1). *Cf. United States v. The Rainbow Family*, 695 F.Supp. 294 (E.D.Tex.1988) (the Rainbow Family, although informal and loosely-knit, has sufficiently tangible structure to render it subject to suit under Rule 17(b)). Each of the *in personam* claims asserted against the Bonanno Family in the complaint are, however, predicated on 18 U.S.C. § 1964. Consequently, in addition to being at least an association-in-fact for purposes of Rule 17(b)(1), the Bonanno Family must, in order to be subject to suit under RICO, be a "person"—that is, an "entity capable of holding a legal or beneficial interest in property."

We note preliminarily that the complaint's catalog of properties allegedly "owned" by the Bonanno Family was not an impediment to the district court's inquiry into the sufficiency of the pleadings. Using circular logic, the government argues that the Bonanno Family must be capable of holding a legal or beneficial interest in property because the complaint alleges, and the district court was obligated to assume, that it "actually does hold such an interest." Brief for the Appellant at 39; see Cplt. ¶¶ 68–69, 72, 76, 79, 84, 88, 92, 96, 99, 103, 107, 110, 115. We agree that the district court was constrained to accept the complaint's allegations as true but only to the extent that they were factual. "[L]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A J. Moore, *Moore's Federal Practice*, ¶ 12.07[2.–5] at 63–64 (2d ed. 1987). Accepting as true the government's characterization of the Bonanno Family's purpose, structure, and activities, it remained for the court to decide whether such an entity had the capacity to own property.

To resolve this question, we will first consider the government's argument that the Bonanno Family is not simply a loose association-in-fact but is akin to a partnership or at least a joint venture, despite the absence of a specific allegation to that effect in the complaint. Measuring the allegations of the complaint against the essential characteristics of these two types of business organizations, we find the government's analogy to be dubious at best.

In New York, as in most other states, there are several significant indicia of the existence of a partnership relationship among various owners of interests in a business venture. These include: (1) the pro-rata sharing of profits and losses

of the enterprise, (2) the pro-rata contribution to the capital of the enterprise, (3) the joint ownership and interest in the enterprise's assets by all investors, (4) the intention of the parties that they be partners, and (5) the partners all having some voice in the management of the enterprise. 43 N.Y.Jur. Partnership §§ 30–41; 59 Am.Jur. Partnership §§ 39–47.

*Tenney v. Insurance Co. of North America,* 409 F.Supp. 746, 748–49 (S.D.N.Y. 1975). A close reading of the complaint does not reveal two or more persons who function as partners. None of the allegations state or even intimate that any two or more of the named family members have anything resembling a rough equality of power in the management of the organization or joint-ownership of its assets, let alone an intention to be partners in the conventional sense. On the contrary, the relationship among the family members resembles that of the hierarchy in a privately owned company, and a rather strict one at that. Thus

> [t]he Bonanno family operates and has operated at all times relevant to the instant action through groups known as "crews." Each crew has as its leaders a person known as a "Capo," who is the captain or boss of a crew.... [a] "Capo" of a crew is supervised by, reports to, and, where necessary, is supported by the head of the Bonanno Family, who is known as the "Boss." The Boss has a second-in-command, known as the "Underboss." The Bonanno Family also has a counselor or advisor, known as a "Consigliere," who advises about intra-Family disputes....
>
> ....
>
> [T]he Bonanno Family rules dictate that a crew member cannot participate in illegal activities without the prior approval of the crew member's Capo. Likewise, a Capo can only undertake an illegal activity after the Boss or the Underboss has approved the activity.

Cplt. ¶ 4. There is in addition no indication that family members agree to share losses. While such an organization may commonly be thought of as a "partnership in crime,"

it does not appear to be a functioning partnership. The strict hierarchical structure, and the lack of any apparent joint control or commingling of property, also distinguish the Bonanno Family from a joint-venture. *See McGhan v. Ebersol,* 608 F.Supp. 277 (S.D.N.Y.1985).

In any event, even if the complaint could be amended to ascribe to the Bonanno Family the requisite features of a partnership or a joint venture, the organization described in the complaint lacks the capacity to hold a legal or beneficial interest in property for a more fundamental and obvious reason: In its purpose, structure, and operations it is wholly and innately unlawful.

Under both federal and state law, illegal agreements, as well as agreements contrary to public policy, have long been held to be unenforceable and void, *see Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982); *Walters v. Fullwood,* 675 F.Supp. 155 (S.D.N.Y.1987); *United Calendar Mfg. Corp. v. Huang,* 463 N.Y.S.2d 497, 94 A.D.2d 176 (2d Dep't 1983); *Silvera v. Safra,* 361 N.Y.S.2d 250, 79 Misc.2d 919 (Sup.Ct.N.Y.Cty.1974), and even where a contract is not itself unlawful, the bargain may still be illegal under New York law if it is closely connected with an unlawful act. *Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d 81 (2d Cir.1982). The same principle demands that rights in or arising out of illegal partnerships not be recognized:

> An alleged partnership founded upon an illegal basis or one contrary to public policy cannot be used to establish any rights of the parties involved as parties. Moreover, if the purpose or subject matter of a partnership contract is illegal or against public policy, the contract may be held to be void.

15 N.Y.Jur.2d *Business Relationships* § 1296, at 581–82 (1981); *see Woodsworth v. Dennett,* 43 N.Y. 273 (1871); *Courtney v. Riordan,* 192 Misc. 53, 79 N.Y.S.2d 658 (1948). A particularly apt example, for our purposes, is *Rutkin v. Reinfeld,* 229 F.2d 248 (2d Cir.), *cert. denied,* 352 U.S. 844, 77

S.Ct. 50, 1 L.Ed.2d 60 (1956). There, the plaintiff filed an action against his former partner and various third parties, alleging that they defrauded him out of his interests in properties related to the distillation and sale of liquor. The evidence at trial revealed that Rutkin, Reinfeld, and others were in fact "partners" in a bootlegging operation during prohibition, and that the properties involved in the lawsuit were purchased with an eye towards the further illegal importation of liquor. Finding that "[a] member of ... an illegal partnership is not entitled to enforcement of any right depending on the partnership agreement," *id.* at 256, the court reversed the judgment against the defendants, *id.* at 257. Accepting as true the allegations in the complaint, the Bonanno Family differs from the Rutkin/Reinfeld partnership only in that it is larger, stronger, and more malevolent.

If the courts will not recognize or enforce rights arising out of illegal partnerships, then, *a fortiori*, the property rights of less formal but no less inherently illegal arrangements like organized crime families will receive no greater recognition. Moreover, even without the taint of illegality, the Bonanno Family would not have the capacity to hold title to property if, as we believe, it is simply an unincorporated association:

> Since unincorporated associations, clubs, societies, unless recognized by statute, have no legal existence, they cannot, in the absence of statutory authorization, take or hold property in the association name, either by way of gift or purchase. Thus, an unincorporated voluntary association is incapable of taking or holding either real or personal property.

6 N.Y.Jur.2d *Associations and Clubs* § 6, at 329 (1980). *See Reinisch v. New York Stock Exchange,* 52 F.R.D. 561 (S.D.N.Y. 1971).

The absence of a cognizable legal existence separate from its members would also appear to render useless a judgment against an association like the Bonanno Family since "proof of either knowledge of or ratification of an association's wrongful acts is crucial to extension of additional personal liability to its members." *Expert Elec., Inc. v. Levine,* 554 F.2d 1227 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). Absent public acknowledgment of family membership or the existence of property openly held in the family's name, proceeding against alleged family members to enforce or satisfy a prior judgment or to seize family "property" ostensibly owned by individual family members would not, it appears, be any more effective than proceeding in the first instance directly against such individuals. The natural and seemingly effective place for locating crime families in RICO pleadings is in the "enterprise" element, where it is already commonly used to proceed against illicit organizations' members, proceeds, and "property" in single actions. *See, e.g., United States v. Persico,* 832 F.2d 705 (2d Cir.1987) (fourteen defendants indicted for managing and participating in the "Colombo Family racketeering enterprise"), *cert. denied,* —— U.S. ——, 108 S.Ct. 1995, 100 L.Ed.2d 227 (1988); *United States v. Langella,* 804 F.2d 185 (2d Cir. 1986) (indictment against nine individuals alleged to be the members of an enterprise known as "the Commission of La Cosa Nostra" which resolved disputes among and carried out joint activities involving the principal Mafia families in New York City); *United States v. International Brotherhood of Teamsters,* 708 F.Supp. 1388, 1392 (S.D.N.Y.1989) (civil complaint against International Brotherhood of Teamsters, "the Commission of La Cosa Nostra," and 26 La Cosa Nostra members alleging conspiracy to participate in a "massive enterprise," and seeking "sweeping" equitable relief to reform the union and prevent future Mafia infiltration).

In its attempt to qualify the Bonanno Family as a RICO "person," the government, as it did on the question of the United State's standing under Section 1964(c), also resorts to the expansive statutory definition of "person" to advance an interpretation not supported by the language of the Act. Whatever categories of non-enumerated persons are eventually found to be included in 1961(3), however, an organized

**30**

crime family is not one of them. First, as a general matter, use of the qualifier "includes" cannot mean that we are free to ignore the evidence of congressional intent, including the enumerated examples, and simply read the definition of "person" as *all*-inclusive. More significantly, the ruling sought by the government would not complement the enumerated examples but would render one of them superfluous, if not absurd. Only those entities capable of holding an interest in property qualify as "persons" under Section 1961(3). To say that an essentially illegitimate entity is a person would read the property-right restriction out of the statute.

Finally, in light of the absence of any clear evidence in the legislative history that Congress intended a different result, we again decline the invitation to use the "liberal construction" clause to undermine the choices Congress made in fashioning RICO as it did.

Accordingly, the judgment appealed from is in all respects affirmed.