**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Mary Frances CARRIER,**
**Defendant-Appellant.**

**No. 1182, Docket 82–1432.**

United States Court of Appeals,
Second Circuit.

Submitted April 26, 1983.

Decided May 20, 1983.

Frederick J. Scullin, Jr., U.S. Atty., N.D. N.Y., Gary L. Sharpe, Asst. U.S. Atty., Syracuse, N.Y., for plaintiff-appellee.

Ronald R. Benjamin, Binghamton, N.Y., for defendant-appellant.

Before KEARSE, PIERCE and PECK,* Circuit Judges.

## PER CURIAM:

Defendant Mary Frances Carrier appeals from a judgment of conviction entered in the United States District Court for the Northern District of New York, Roger J. Miner, *Judge,* 517 F.Supp. 644, after a jury verdict finding her guilty of threatening the life of the President of the United States, in violation of 18 U.S.C. § 871(a) (1976). Carrier was sentenced to five years' imprisonment. On appeal she contends principally that the evidence was insuffi-

cient to support her conviction. We find her contention without merit [1] and we affirm the judgment.

Section 871(a) makes it unlawful "knowingly and willfully" to make "any threat to take the life of or to inflict bodily harm upon the President of the United States." [2] In a prior opinion in this case, *United States v. Carrier,* 672 F.2d 300 (2d Cir.), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982), familiarity with which is assumed, we considered the district court's dismissal of the indictment on the ground that the words allegedly uttered by Carrier could not under any circumstances constitute "threats" within the meaning of § 871(a). Recognizing that § 871(a) reaches only "true threats" and not mere political hyperbole that is protected by the First Amendment, *see Watts v. United States,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), we reversed the judgment of dismissal and ruled that, since the indictment was sufficient on its face, the question whether the words used were a true threat should be left to the triers of fact.

Following the remand, Carrier was tried, and evidence of her alleged statements and of the circumstances in which they were made was presented to the jury. Viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence showed, *inter alia,* that Carrier was arrested on state charges and was found to have in her possession an envelope that bore several phrases demonstrating an antipathy toward the President and others, including the phrase "Murder the President." This information was given to Secret Service Special Agent Kevin Mitchell, who sought

---

* Honorable John W. Peck, Senior Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. We have also considered Carrier's other arguments and find them to be without merit.

2. The pertinent portions of 18 U.S.C. § 871 are as follows:

    (a) Whoever knowingly and willfully deposits for conveyance in the mail or for a

delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States ... or knowingly and willfully otherwise makes any such threat against the President ... shall be fined not more than $1,000 or imprisoned not more than five years, or both.

to interview Carrier in the Broome County, New York, jail in which she was being held. As Mitchell displayed his credentials and the envelope to Carrier and attempted to introduce himself, Carrier interrupted, stating, " 'Yes, I know why you are here. The President should be murdered. Yes, I wrote that—' .... 'Yes, I threatened the President.' " (Tr. 106.) Carrier remained in the interview room for approximately two minutes, during which she repeated these statements over and over and insulted Mitchell several times. She was neither laughing nor smiling and did not appear jocular; rather she appeared to be upset and antagonistic.

At a subsequent interview, at which Mitchell advised Carrier that it was unlawful to threaten the life of the President, Carrier appeared to be calm, courteous, and friendly and answered some of Mitchell's questions. She stated that she was very familiar with the use of firearms, that she was a successful hunter, and that she owned rifles, shotguns, and a .32 caliber pistol. She refused, however, to discuss the location or purpose of the .32 caliber pistol. Finally, when Mitchell asked about the envelope, bearing the phrase "Murder the President," Carrier became impatient and stated, " 'It is too bad Hinkley wasn't successful in killing that son of a bitch. He deserved what he got.' " (Tr. 116.) Thereafter, while Mitchell was transporting Carrier to the federal courthouse, Carrier repeatedly stated, "[I]t was too bad that Hinkley wasn't successful in killing that son of a bitch"; "[I]f need be I would shoot him"; and "He deserved what he got." (Tr. 119.) After her court appearance—at which her statements to the judge and others were vituperative and profane—when she was prevented from leaving a room, Carrier stated that " 'The only thing I will do is blow the [P]resident's head off, the President of the United States.' " (Tr. 121–22.)

Mitchell's investigation of Carrier disclosed, *inter alia,* that Carrier traveled extensively, had no permanent address, and lived out of her car, and that she had traveled to Dumfries, Virginia, a location where President Reagan rides horses. After Carrier's release from county jail, the Secret Service received a letter written by Carrier referring to Dumfries, Ronald Reagan, and a gun.

Carrier argues that none of the evidence showed that she had any kind of a plan to carry out her alleged threats, and, hence, they could not have been found "true" threats. This argument is misplaced:

> A threat made with no present intention of carrying it out may still restrict the President's movements and require a reaction from those charged with protecting the President. Because § 871 was intended to prevent not simply attempts on the President's life, but also the harm associated with the threat itself, ... the statute should be construed to proscribe all threats that the speaker intends to be interpreted as expressions of an intent to kill or injure the President.

*Rogers v. United States,* 422 U.S. 35, 47, 95 S.Ct. 2091, 2098, 45 L.Ed.2d 1 (1975) (Marshall, J., concurring).

From all the evidence the jury was entitled to infer that Carrier intentionally and knowingly made the statements attributed to her and that she intended that they be understood by others as a serious threat to the President. She repeatedly stated that the President should be killed, bearing an unvaryingly serious demeanor while making those statements to a person having responsibility for ensuring the safety of the President. She possessed an arsenal of weapons. And she had traveled to a location where the President was known to ride horses. The evidence was sufficient to support Carrier's conviction under § 871.

The judgment is affirmed.