**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John Edward MEDVED,**
**Defendant–Appellant.**

No. 89–3658.

United States Court of Appeals,
Sixth Circuit.

Argued March 6, 1990.

Decided June 12, 1990.

Order July 26, 1990.

William J. Edwards, Asst. U.S. Atty., Samuel A. Yannucci (argued), Office of the U.S. Atty., Cleveland, Ohio, for plaintiff-appellee.

Donald Krosin (argued), Office of the Federal Public Defender, Cleveland, Ohio, for defendant-appellant.

Before WELLFORD and NELSON, Circuit Judges; and ZATKOFF, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is a bank robbery case. The defendant admitted having committed the robbery and admitted the use of a toy gun in doing so. Rejecting an insanity defense, the jury found the defendant guilty of robbing a federally insured bank, a violation of 18 U.S.C. § 2113(a), and of putting lives in jeopardy during the offense by use of a dangerous weapon, a violation of 18 U.S.C. § 2113(d). The district court sentenced the defendant to imprisonment for 96 months. The sentence represented an upward departure from the range indicated by the sentencing guidelines.

On appeal, the defendant contends that the district court erred in (1) not *sua sponte* putting a stop to cross-examination of the defendant and his girlfriend about their conversations and thoughts on robberies the defendant might have committed in the past and on bank robberies generally; (2) allowing the jury to treat the toy gun as a "dangerous weapon;" (3) instructing the jury—in language proposed by the defendant's own counsel—that the affirmative defense of insanity should be determined from all the evidence, rather than from the opinions of experts alone; and (4) misapplying the sentencing guidelines. We find none of these contentions persuasive, and we shall affirm the conviction and sentence.

I

The defendant, John Edward Medved, robbed the New Waterford Bank in Boardman, Ohio, on the afternoon of October 11, 1988. Testimony subsequently presented at his trial established that Mr. Medved was not working regularly and had run out of money; that on the morning of the robbery he and his girlfriend, Darlene Drokin, tried unsuccessfully to get financial help from a soldiers' relief organization; that they then drove to a toy store where they stole a toy handgun and a black Magic Marker that was used to make the toy gun look more like a real weapon; that they subsequently drove to the bank, which Mr. Medved entered alone; that pointing the toy gun at a teller and demanding "tens and twenties, Honey," Mr. Medved relieved her of approximately $2,470; that in like manner he obtained an additional $1,010 from a second teller; that after leaving the bank, Mr. Medved was driven away by Ms. Drokin; and that they were apprehended

---

* The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

by the police later that afternoon with most of the money still in their possession.

A week after the robbery a grand jury handed up a two count indictment. Count one charged both Mr. Medved and Ms. Drokin with armed bank robbery. Count two, which was later dismissed by the government, charged Mr. Medved with violating the laws against possession of firearms by convicted felons.

Ms. Drokin pleaded guilty pursuant to a plea bargain. The armed bank robbery charge against Mr. Medved was tried in the courtroom of the Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio.

Mr. Medved's counsel put on an extensive defense, designed primarily to convince the jury that Mr. Medved suffered from a serious mental defect that affected every part of his life. In addition to presenting expert psychological and psychiatric testimony on this subject, the defense brought out the facts that Mr. Medved spent 10 years in prison following a 1976 conviction for three other bank robberies; that he claimed to believe the mafia had made numerous attempts on his life following his release from prison in 1986; that he and his girlfriend had frequently talked about the prior bank robbery case, and about how he feared for his life because of the earlier case; that he said he never wanted to go back to prison, but still exhibited a fascination with banks; that he found it hard to pass by a bank without going inside; that he failed to take simple precautions to avoid capture after the October 11 robbery; and that, as the girlfriend put it, he "wasn't all there. Nothing he said or did made sense."

The case was submitted to the jury under a comprehensive and balanced set of instructions. After the jury returned its verdict of guilty, a probation officer prepared a presentence report giving his thoughts on the proper way to make the calculations called for by the United States Sentencing Commission's *Guidelines Manual*. The report assigned the crime a total offense level of 21 and placed the defendant in Criminal History Category III, producing an indicated sentence of imprisonment in the range of 46 to 57 months.

Without challenging the probation officer's calculations, the government moved for an upward departure. The views of both sides were fully explored at a sentencing hearing conducted on July 5, 1989. Judge Dowd then announced, for reasons explained on the record, that he would proceed as if the offense level were 23 instead of 21 and the criminal history category VI instead of III. The Sentencing Table in the *Guidelines Manual* shows a range of 92–115 months at the intersection of level 23 and Category VI. The court imposed a sentence—96 months—within that range. The defendant has perfected a timely appeal.

## II

■ At trial, the opening statement of defendant Medved's counsel disclosed to the jury not only that Mr. Medved did in fact take the money from the Boardman bank on October 11, 1988, but also that he had been released from prison in 1986. The government, for its part, made no mention of any prior crimes in its opening statement or during its case-in-chief.

When Mr. Medved took the stand to testify on his own behalf, his counsel promptly elicited from him the information that he had been convicted of three counts of bank robbery in 1976, after which he served 10 years in a federal prison. This factual background helped set the stage for subsequent testimony designed to show that Mr. Medved had "delusions" about the mafia trying to kill him because of the earlier case. Mr. Medved testified at length about his fears that people were trying to do away with him. Although a government psychiatrist called by the defense expressed the opinion that Mr. Medved was "malingering," the defendant's own expert witnesses were to testify that he suffered from a paranoid or delusional disorder. The government's theory was that Mr. Medved robbed the bank in Boardman because he enjoyed the excitement and needed the money; the theory of the defense—disclosed to the jury in opening statement—was that he did it because he was insane.

Notwithstanding that Mr. Medved had placed his mental condition directly in issue, it is contended on appeal that the district court committed reversible error in failing to put a stop to a line of cross-examination that began when the government put the following questions to Mr. Medved:

"Q. Mr. Medved, in August of 1988 did you begin talking to any individual about robbing banks again?

A. No.

Q. Do you recall making any statement in August of 1988 to the effect of what a great feeling it is to jump over the counter at a bank?

A. No.

Q. Do you recall making any statement to an individual expressing the exhilaration that you felt in robbing banks?

A. No.

Q. Did you tell any individual that your MO in the bank record was jumping over the counters?"

Defense counsel interposed an objection before the last question was answered, requesting that the prosecutor "be a little more specific." Judge Dowd then asked the prosecutor about the predicate for these questions. The prosecutor replied that "Darlene Drokin is going to testify that Medved made those statements to her." Taking defense counsel's point, the Judge said "I think in fairness to the witness, you should identify the person rather than leave it in the abstract."

The prosecutor did as he was told, and Ms. Drokin was specifically identified when the cross-examination of Mr. Medved resumed:

"Q. Mr. Medved, did you in August of 1988 indicate to Darlene Drokin that you will have changed your MO in robbing banks?

A. No, I haven't. I'd like to indicate something.

THE COURT: Well, just respond to his questions now, Mr. Medved.

Q. Do you recall in August of 1988 telling Darlene Drokin that you didn't want to go back to prison?

A. Well, I've indicated that, yes."

We have now quoted in its entirety the only part of Mr. Medved's cross-examination to which exception is taken on appeal.

The defendant's next witness was Darlene Drokin. The cross-examination of Ms. Drokin showed that the prosecutor did, as he claimed, have a basis for the questions he had put to Mr. Medved earlier. After reminding Ms. Drokin of her testimony about conversations with Mr. Medved concerning the 1976 conviction (a conviction that Mr. Medved felt was "illegal," according to Ms. Drokin), the prosecutor elicited this testimony:

"Q. Now, in August of '88, did he talk to you at all about bank robberies in general?

A. For as much as he will say about bank robberies and the thrill of doing it and going in and how he done it and vaulting the counter and whatever, the next conversation was that he could never go back, never do it again. It was one extreme to the other.

Q. But he indicated that there was a certain exhilaration in jumping over the counter?

A. Yes, absolutely.

Q. Did he indicate to you that he could never utilize that same procedure in any bank robbery because the FBI would know immediately who did it?

A. Yes, he felt if there were any banks robbed that, of course, he will be the first one looked at.

Q. Did there come a point in time when you suspect that he was involved in a bank robbery?

A. Yes.

Q. And when was that?

A. Prior to this bank robbery.

Q. In August of 1988?

A. Yes.

Q. Is that a fair statement? Did he ever indicate to you that he robbed another bank?

MR. INGRAM: Objection.

THE COURT: Overruled.

A. John never come right out and said that he robbed a bank.

Q. But you suspected that he had?

A. Yes."

Given the context, and given the paucity of objections by defense counsel, it is hardly self-evident that the district court should have stopped the questioning of either Ms. Drokin or Mr. Medved, or that the court should have given a limiting instruction without being asked to do so. In his brief, Mr. Medved asserts that Ms. Drokin was being cross-examined about a robbery that was supposed to have occurred in August of 1988 and about which no evidence had been presented. Perhaps so, but a reading at least equally plausible, it seems to us, is that both witnesses were simply being asked about conversations they had in August of 1988, not about a bank robbery committed at that time.

Without objection, Ms. Drokin testified that Mr. Medved talked to her in August about the "thrill" of bank robberies in general, the "exhilaration of jumping over the counter," and the need of using a different *modus operandi* in any future bank robbery. It was in August that Ms. Drokin came to "suspect" that Mr. Medved had actually been involved in a prior bank robbery, as the jury might well have understood; it does not necessarily follow that he was supposed to have committed any bank robbery in August. Surely there could be nothing wrong in the jury's learn-

ing that Ms. Drokin suspected in August that Mr. Medved was guilty of one or more of the robberies of which he had been convicted in 1976. If defense counsel thought the questioning related to a robbery for which no foundation had been laid, it was counsel's job to alert the court to this fact.

In the absence of proper objections, the only issue before us on appeal is whether allowance of the testimony now complained of constituted plain error. See Rule 52(b), Fed.R.Crim.P. ("Plain errors ... may be noticed although they were not brought to the attention of the court.") As we said in *United States v. Rodriguez*, 882 F.2d 1059, 1064 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990), "[p]lain errors are limited to those so objectionable that they should have been apparent to the trial judge or that strike at the fundamental fairness, honesty or public reputation of the trial." (Citations omitted.)

No such error was committed here. The testimony in question served the permissible purpose of showing that the Boardman bank was robbed not because Mr. Medved was insane, but because he enjoyed the thrill of robbing banks. The testimony showed that as long as two months before the Boardman robbery, Mr. Medved was thinking about how he could commit such a crime without using the procedure employed in the robberies for which he had been sent to prison before. The testimony necessarily referred to prior criminal acts, but the fact that Mr. Medved had been convicted for those acts had already been brought out by the defense itself—and there was nothing unfair about the prosecutor's walking through the door the defense had opened.

Even if the jury had inferred that Mr. Medved was involved in an additional bank robbery between the ones for which he was convicted in 1976 and the one he committed in October of 1988, we do not believe it would have rendered the trial fundamentally unfair. The problem often presented by evidence of "prior bad acts"—that such evidence may give the jury too strong a message about the likelihood that the defendant committed the act or acts for which he is on trial—is not presented here. There was no issue in this case as to whether it was Mr. Medved who robbed the bank in October; Mr. Medved admitted that he was the robber. The contention, rather,

was that Mr. Medved was insane—and if he was insane in October, it would have been perfectly reasonable for the jury to conclude that he was insane in August as well.

### III

Section 2113(d) of Title 18, U.S.C., provides among other things that

> "Whoever, in committing ... any [bank robbery] ... puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both."

At trial, the defendant's counsel offered timely motions for acquittal on the ground that the government had not presented evidence from which the jury could find that Mr. Medved had jeopardized anyone's life by the use of a "dangerous weapon or device."

There was ample evidence, however, that the toy used by Mr. Medved in the robbery looked like a real gun. Mr. Medved testified that although the toy had a red screw at its end, he colored the screw black so that the fake gun would be taken seriously when pointed at someone during the robbery. On motion of the defendant, the court received in evidence a toy gun that Darlene Drokin testified was "identical" to the one she and Mr. Medved had stolen. An FBI agent showed the jury his own .38 caliber revolver, and the jury was permitted to make a visual comparison of the service revolver and the toy gun. Both of the bank tellers at whom Mr. Medved pointed the toy gun testified at trial, and both tellers referred to what Mr. Medved was holding as a "gun;" there has never been any suggestion that either teller realized the gun was not real.

In *United States v. Martinez–Jimenez*, 864 F.2d 664 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 1576, 103 L.Ed.2d 942 (1989), the Court of Appeals for the Ninth Circuit considered a factual situation closely analogous to that presented here; the only significant difference is that in *Martinez–Jimenez* the robber held his toy gun downward and never pointed it at anyone. Relying on the logic of the Supreme Court's opinion in *McLaughlin v. United States*, 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986) (conviction under § 2113(d) upheld where bank robber used unloaded handgun), the Ninth Circuit held

that a toy which looked like a real gun could be a "dangerous weapon or device," and its use could put people's lives in "jeopardy." As the court explained,

> "A robber who carries a toy gun during the commission of a bank robbery creates some of the same risks as those created by one who carries an unloaded or inoperable genuine gun. First, the robber subjects victims to greater apprehension. Second, the robber requires law enforcement agencies to formulate a more deliberate, and less efficient, response in light of the need to counter the apparent direct and immediate threat to human life. Third, the robber creates a likelihood that the reasonable response of police and guards will include the use of deadly force. The increased chance of an armed response creates a greater risk to the physical security of victims, bystanders, and even the perpetrators. Therefore the greater harm that a robber creates by deciding to carry a toy gun is similar to the harm that he creates by deciding to carry an unloaded gun."

*Martinez–Jimenez,* 864 F.2d at 666–67.

We agree, and we would add that the apprehension created by the display of what appears to be a genuine gun can bring on heart attacks and other untoward medical consequences. *Martinez–Jimenez* was decided correctly, in our view, and we adopt it as the law of this circuit.

### IV

■ Before the jury was even selected in this case, Judge Dowd showed counsel a copy of the charge he anticipated giving on the insanity issue. A week later the defendant filed a written motion asking that the following language be added to the Court's proposed insanity charge:

> "The Defendant has offered expert testimony bearing on his mental condition. The affirmative defense of insanity should be determined by you from all the evidence, rather than from the opinions of experts [alone]. This includes the testimony of [lay] witness[es,] if you determine such testimony is pertinent to the Defendant's mental condition[,] and all the facts and circumstances surrounding the offense charged." (Typographical errors corrected.)

The authority cited for the proposed instruction was *United States v. Fortune,*

513 F.2d 883 (5th Cir.), *cert. denied,* 423 U.S. 1020, 96 S.Ct. 459, 46 L.Ed.2d 393 (1975). The court changed the first sentence to the passive voice—"Expert testimony bearing upon the defendant's mental condition has been offered"—but otherwise incorporated the proposed language in its charge exactly as the defendant had requested. The balance of the insanity charge basically tracked the language of 18 U.S.C. § 17.

Elsewhere in its instructions the court included some boilerplate on evaluation of opinions expressed by expert witnesses. The defendant made no objection either to the charge on insanity or to the charge on expert opinions. If the defendant had an objection, he should have voiced it; Rule 30, Fed.R.Crim.P., provides that "[n]o party may assign as error any portion of the charge ... unless that party objects thereto before the jury retires to consider its verdict...." *Cf. United States v. Hook,* 781 F.2d 1166 (6th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986); *United States v. Terry,* 729 F.2d 1063 (6th Cir.1984).

On appeal, Mr. Medved (now represented by different counsel) argues that the court was led to commit plain error. He contends that because, by reason of Rule 704(b), Fed.R.Evid.,[1] "the jury heard no expert opinions," the jury would have been puzzled as to why no expert opinions were forthcoming and might have assumed that any opinions would be adverse to the defendant.

We do not find this argument convincing. It is true that no witness was asked to express an opinion on whether the defendant was able to appreciate the nature and quality or the wrongfulness of his acts, but the jury did hear substantial expert opinion testimony on Mr. Medved's mental condition. Dr. James Giannini, a highly qualified psychiatrist who examined the defendant at counsel's request, testified that he had been able to diagnose the defendant, with a reasonable degree of medical certainty, as suffering from a recognized mental disorder called "delusionary disorder, persecutory type." Dr. Giannini described the characteristics of this disorder in considerable detail, and testified that it "rules a person's life." He testified further that

---

**1.** Rule 704(b) prevents expert witnesses from stating an opinion "as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto."

periodic cocaine usage, to which Mr. Medved admitted, "would tend to aggravate it."

Timothy Khol, an expert witness with a doctorate in clinical psychology, also examined Mr. Medved. "It was my opinion," Dr. Khol testified, "that Mr. Medved had a paranoid disorder," also called a "delusional disorder." The suggestion that the jury heard no expert opinions is simply not correct.

In addition to the expert opinion testimony, the jury heard an abundance of lay testimony on Mr. Medved's supposedly irrational fears and behavior. On the strength of his own testimony, and that of his girlfriend and a police lieutenant who had been exposed to Mr. Medved's allegedly delusional thinking, defense counsel was able to argue to the jury, in words evoking Dr. Giannini's testimony, that "this delusional disorder has affected ... every part of [Medved's] life."

Because the defense was relying so heavily on lay testimony, it is obvious why trial counsel should have thought it advantageous to have the court tell the jury that all pertinent testimony, including that of lay and expert witnesses alike, ought to be taken into account in determining the defendant's sanity. We see no merit at all in the belated claim that the giving of the instruction requested by the defendant's counsel was so unfair to the defendant as to constitute plain error.

## V

Mr. Medved's final claim of error relates to the length of the sentence.

As noted above, the probation officer's pre-sentence report set forth calculations in which the total offense level was fixed at 21 and the defendant's criminal history was placed in Category III. Although he did not question these calculations, Judge Dowd found that there were aggravating circumstances, not adequately taken into consideration in the formulation of the guidelines, which justified increases in both the offense level and criminal history category, and therefore justified a sentence outside the range described in the guidelines. See 18 U.S.C. § 3553(b).

■ As to the upward adjustment in the offense level, Judge Dowd recognized that the guidelines would have mandated an increase in the offense level by three if the defendant had brandished or displayed an actual firearm during the robbery. U.S.

S.G. § 2B3.1(b)(2). Pointing out that the use of a replica was a concept not addressed in the guidelines, Judge Dowd increased the offense level by two.

Citing *United States v. Rodriguez,* 882 F.2d 1059, 1067 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990), Mr. Medved argues that "mere use of a toy gun" cannot be considered "unusual" enough to warrant an increase. On November 1, 1989, however, less than four months after sentence was imposed here, the Sentencing Commission amended the guidelines to provide that brandishing or displaying an object that merely "appeared" to be a dangerous weapon would result in the same three-level increase called for where an actual dangerous weapon is used. (This change was accomplished by adding the following instruction to Application Note 1(d) following U.S.S.G. § 1B1.1: "Where an object that appeared to be a dangerous weapon was brandished, displayed, or possessed, treat the object as a dangerous weapon.") Judge Dowd was obviously correct in realizing that as of July 5, 1989, the question of fake weapons had not been taken into consideration adequately.

Defendant argues further that the use of a real or simulated dangerous weapon was already taken into account by the jury when it found a violation of 18 U.S.C. § 2113(d). The upward departure, it is suggested, therefore constituted "double counting."

This argument would be much more persuasive if the guidelines had started out by setting a higher offense level for armed robbery than for unarmed robbery. That is not how the guidelines work, however. They start with the same offense level for both types of crime, and then call for an increase if a dangerous weapon was used.

We note, moreover, that even if Judge Dowd had stayed with an offense level of 21, the sentence he imposed would still have been within the range specified at the point on the sentencing table where offense level 21 intersects with Criminal History Category VI.

■ With regard to the upward departure in the criminal history category, a question is presented as to whether the sentencing court should have given consideration to Categories IV and V rather than moving directly from Category III to Category VI. See *United States v. Kennedy,*

893 F.2d 825, 829 (6th Cir.1990), where we held that "a sentencing court must first look to the next higher Criminal History Category before otherwise departing from the guidelines."

The reason Judge Dowd made a direct multi-level increase in the criminal history category was this: Although Mr. Medved had only one prior felony conviction on his record, that conviction related to three separate bank robberies committed on three separate occasions over a period of about eight months. If those crimes had led to two or three separate felony convictions, as they might well have done, Mr. Medved would have been classified as a "career offender" under U.S.S.G. § 4B1.1. This section of the guidelines directs that "[a] career offender's criminal history category *in every case* shall be Category VI." (Emphasis supplied.)

No such reason for a multi-level increase was present in *Kennedy* or in *United States v. Cervantes*, 878 F.2d 50 (2d Cir. 1989), the decision on which *Kennedy* was based. Under the circumstances presented here, we believe that Judge Dowd was justified in finding, as he did, that Criminal History Category III significantly underrepresented the seriousness of Mr. Medved's actual criminal history, and that Category VI was "the only appropriate Criminal History Category."

We find no merit in additional arguments advanced by Mr. Medved as to the supposed absence of any "leadership" role on his part, see U.S.S.G. § 3B1.1(c), and his supposed "acceptance of responsibility," see U.S.S.G. § 3E1.1(a). These arguments turn on factual questions where the district court's findings may be reversed only if clearly erroneous. *United States v. Perez*, 871 F.2d 45 (6th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989); *United States v. Wilson*, 878 F.2d 921 (6th Cir.1989). Far from being clearly erroneous, we think the district court's findings are clearly correct.

AFFIRMED.

### ORDER JULY 26, 1990.

This matter comes before us on a notice of defendant-appellant Medved's desire to have his counsel seek rehearing with suggestion for rehearing en banc. In a second filing Mr. Medved requests that we amend the recital of facts in our opinion of June 12, 1990.

The notice of desire for rehearing points out that our opinion did not address the principal claim raised in a brief that Mr. Medved filed *pro se* to supplement the brief filed by his counsel. We shall deal with that claim now.

The claim appears to be that Mr. Medved did not receive effective assistance of counsel at trial. In this connection Mr. Medved notes that his probation officer was not called to testify, despite Mr. Medved's belief that the probation officer was a very important witness; that counsel allegedly kept certain information from Mr. Medved; and that counsel was unwilling to pursue a defense of "temporary insanity" caused by "duress."

Every trial lawyer has a professional obligation to exercise his best judgment on matters of trial tactics and strategy, and reasonable people often differ on such matters. It is possible—if most unlikely—that Mr. Medved had a better sense of trial strategy than his lawyer did, but such a circumstance would not mean that the lawyer's assistance was "ineffective" in a constitutional sense.

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), teaches that in order to prevail on his ineffective assistance of counsel claim, Mr. Medved would first have to show that his lawyer made errors so egregious that he simply was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 687, 104 S.Ct. at 2064. We have declared, in this connection, that only "strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel." *Meeks v. Bergen*, 749 F.2d 322, 327 (6th Cir.1984) (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir.1974)).

There is no way, in our judgment, that lawyers of ordinary training and skill in the criminal law could possibly conclude that counsel's conduct of Mr. Medved's defense was not "competent." It is important to bear in mind here that

"Judicial scrutiny of counsel's performance must be highly deferential.... Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (citing *Michel v. Louisiana*, 350 U.S. 91,

101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

Even if he could somehow prove that his lawyer was not functioning as the counsel guaranteed by the Sixth Amendment, Mr. Medved's claim would still fail unless he could also show that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. After a careful review of the record, we are satisfied that the result in this case would have been no different if Mr. Medved's lawyer had conducted the defense exactly as Mr. Medved wanted him to.

On another subject, Mr. Medved complains that our June 12 opinion endorsed a violation of the Ex Post Facto Clause of the Constitution when it referred to an after-the-fact amendment of the Sentencing Guidelines in connection with the trial court's decision to make an upward adjustment in the offense level. Mr. Medved misunderstands the point we were making. Trial courts are not supposed to impose sentences that depart from the guideline range except where there are circumstances that were not adequately taken into account by the Sentencing Commission in formulating the guidelines. Judge Dowd thought that the use of a toy gun was such a circumstance. The subsequent amendment of the guidelines shows that he was correct in so thinking—for if the use of toy weapons had been taken into account by the Commission from the beginning, there would have been no need for the amendment. Judge Dowd did not apply the amendment in determining the sentence, of course, and we did not hold that the amendment ought to be applied; we simply held that there was no error in what Judge Dowd did.

As to the recital of background facts in our original opinion, Mr. Medved takes issue with our statement that "according to him the government planted informers in prison to get him to reveal information about organized crime." The opinion will be amended by deleting the statement in question.*

If Mr. Medved still wishes to petition for rehearing, with or without a suggestion that the rehearing be en banc, he may do so by filing a proper petition within 14 days after entry of this order.

* This has been deleted from the opinion.