UNITED STATES of America, Appellee,

v.

Leroy JOHNSON, Jr., Defendant–
Appellant.

No. 487, Docket 93–1344.

United States Court of Appeals,
Second Circuit.

Argued Nov. 18, 1993.

Decided Jan. 24, 1994.

John F. Laidlaw, Syracuse, NY, for defendant-appellant.

Craig A. Benedict, Asst. U.S. Atty. N.D. New York, Syracuse, NY (Gary L. Sharpe, U.S. Atty. N.D. New York, of counsel), for appellee.

Before: MAHONEY, McLAUGHLIN, and HEANEY,* Circuit Judges.

MAHONEY, Circuit Judge:

Defendant-appellant Leroy Johnson, Jr. appeals from a judgment of conviction entered April 24, 1993 in the United States District Court for the Northern District of New York, Howard G. Munson, *Judge*, after a four-day jury trial. Johnson had been charged by indictment with two counts of threatening to kill then-President Bush in violation of 18 U.S.C. § 871 (1988) (counts one and three), and with threatening to kill former President Reagan in violation of 18 U.S.C. § 879 (1988) (count two).

We affirm.

---

* The Honorable Gerald W. Heaney, United States Circuit Judge for the Eighth Circuit, sitting by designation.

## Background

On December 26, 1989, Johnson was convicted of burglary and incarcerated. Thereafter, while assigned to the Auburn Correctional Facility in Auburn, New York ("Auburn"), Johnson claimed to be depressed and suicidal, and to be hearing voices. As a result, he was sent to the Central New York Psychiatric Center at Marcy, New York ("Marcy") for evaluation.

On June 28, 1991, while at Marcy, Johnson told recreational therapist Tina Fahringer that he was a Shiite Muslim and intended to kill President Bush for his role in the Gulf War, stating that the war was unnecessary and President Bush had "hurt [Johnson's] people." Johnson was subsequently returned to Auburn, but Marcy personnel advised the Secret Service about his threat against President Bush.

In response, Secret Service special agent Alan Kolwaite interviewed Johnson at Auburn on August 1 and August 20, 1991. At the second interview, Johnson told Kolwaite that he was a Shiite Muslim and intended to kill both President Bush because he was trying to take over the oil in the Middle East, and former President Reagan because he had killed Colonel Gadhafi's son (assertedly during the U.S. bombing of Libya that occurred on April 15, 1986, while Reagan was president).

As a result of the threats made on June 28 and August 20, 1991, Johnson was indicted and tried in the Northern District of New York.[1] He presented the defenses of insanity and entrapment. The district court ruled, however, that Johnson could not present evidence of diminished capacity (as distinguished from insanity) "because this is not a specific intent crime." The court also allowed defense expert witnesses who testified in support of Johnson's insanity defense to be cross-examined regarding prior bad acts committed by Johnson, but provided a limiting instruction on that subject. Government rebuttal witnesses were also allowed to testi-

---

1. Although Johnson made statements during the August 1 interview indicating an intention to kill the President, he was not prosecuted for those statements.

fy regarding prior bad acts by Johnson. Finally, after hearing the evidence at trial, the court refused to instruct the jury on the entrapment issue. Johnson took timely objection to all these rulings.

The jury found Johnson guilty on all counts. He was sentenced to fifty-one months imprisonment, two years of supervised release, and the mandatory $150.00 assessment. This appeal followed.

## Discussion

On appeal, Johnson argues that: (1) §§ 871 and 879 are specific intent crimes and thus the district court erred in refusing to admit expert testimony regarding his diminished capacity defense; (2) the district court erred in refusing Johnson's proposed jury instruction regarding entrapment; (3) the district court erred in admitting evidence of Johnson's prior bad acts to refute his insanity defense; and (4) the verdict was not supported by sufficient evidence. We address these contentions in turn.

### A. *Exclusion of Evidence as to Diminished Capacity.*

The district court refused to admit evidence of diminished capacity, ruling that §§ 871 and 879 are general intent crimes. Johnson contends that this ruling was error.

18 U.S.C. § 871(a) provides in pertinent part:

Whoever knowingly and willfully deposits for conveyance in the mail ... any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States ..., or knowingly and willfully otherwise makes any such threat against the President ..., shall be fined not more than $1,000 or imprisoned not more than five years, or both.

Johnson argues that the statutory requirement that a person act "willfully" renders § 871 a specific intent crime. *See United States v. Wells,* 766 F.2d 12, 20 (1st Cir. 1985) ("Willfulness means having the specific intent to do something the law forbids; a general intent to commit the proscribed act is not enough."); *United States v. Garcia,* 751 F.2d 1033, 1035 (9th Cir.1985) (per cu-

riam) (same). Johnson contends that the statute requires the government to establish that he possessed a subjective intent that his statements be interpreted as threats against the President, and that evidence of his alleged mental illness should have been admitted as relevant to whether he possessed the requisite intent at the time he made the threats.

We disagree. It is well settled that § 871 requires only a showing of general intent. The Ninth Circuit, in the leading case on this question, held that

the willfulness requirement of [§ 871] ... require[s] only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress, or coercion. The statute does not require that the defendant actually intend to carry out the threat.

*Roy v. United States,* 416 F.2d 874, 877–78 (9th Cir.1969) (footnotes omitted); *see also United States v. Twine,* 853 F.2d 676, 680 (9th Cir.1988) (saying of *Roy,* "[w]e can imagine no clearer description of an objective, general intent showing").

In *United States v. Compton,* 428 F.2d 18 (2d Cir.1970), *cert. denied,* 401 U.S. 1014, 91 S.Ct. 1259, 28 L.Ed.2d 551 (1971), this court adopted the objective test set forth in *Roy,* quoting the above passage. *Compton,* 428 F.2d at 21 (quoting *Roy,* 416 F.2d at 877–78). A number of other federal courts have subsequently adopted this view. *See e.g., United States v. Kosma,* 951 F.2d 549, 557 (3d Cir. 1991) (collecting cases); *United States v. Manning,* 923 F.2d 83, 85–86 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2860, 115 L.Ed.2d 1027 (1991); *United States v. Vincent,* 681 F.2d 462, 464 (6th Cir.1982); *United States v. Hart,* 457 F.2d 1087, 1090–91 (10th Cir.), *cert. denied,* 409 U.S. 861, 93 S.Ct. 150, 34 L.Ed.2d 108 (1972); *see also Watts v. United States,* 402 F.2d 676, 680–82 (D.C.Cir.1968), *rev'd on another ground,* 394

U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Only one court of appeals has ruled that § 871 requires more than a showing of general intent. *See United States v. Patillo,* 431 F.2d 293, 297–98 (4th Cir.1970) (threat against President uttered without communication to President can form basis for conviction under § 871 "only if made with a present intention to do injury to the President"), *adhered to,* 438 F.2d 13, 16 (4th Cir.1971) (in banc) ("an essential element of guilt is a present intention either to injure the President, or incite others to injure him, or to restrict his movements"); *see also United States v. Hoffman,* 806 F.2d 703, 707, 712 (7th Cir.1986) (ambiguous indication that Seventh Circuit may require proof that defendant intended statement as threat), *cert. denied,* 481 U.S. 1005, 107 S.Ct. 1627, 95 L.Ed.2d 201 (1987).

We do not read our opinion in *United States v. Carrier,* 708 F.2d 77 (2d Cir.1983) (per curiam) ("*Carrier II* "), to require a showing of subjective intent. In *Carrier II,* the defendant appealed her conviction under § 871, contending that the government had failed to present evidence that she planned to carry out her threats against the President. *See* 708 F.2d at 79. We affirmed her conviction, concluding, as we had in *Compton,* 428 F.2d at 21, that § 871 prohibits the making of threats even without a present intention to carry them out. *Carrier II,* 708 F.2d at 79; *see also United States v. Carrier,* 672 F.2d 300, 306 (2d Cir.) ("*Carrier I* ") (prior appeal in *Carrier* ) (same), *cert. denied,* 457 U.S. 1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982).

Rather than citing *Compton* or *Carrier I* for this uncontroversial proposition, however, we responded to the defendant's contention in *Carrier II* by quoting an excerpt from Justice Marshall's concurring opinion in *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), stating that:

"A threat made with no present intention of carrying it out may still restrict the President's movements and require a reaction from those charged with protecting the President. Because § 871 was intended to prevent not simply attempts on the President's life, but also the harm associated with the threat itself, ... the statute should be construed to proscribe all threats *that the speaker intends to be interpreted as expressions of an intent to kill or injure the President."*

*Carrier II,* 708 F.2d at 79 (quoting *Rogers,* 422 U.S. at 47, 95 S.Ct. at 2098 (Marshall, J., concurring) (emphasis added here, deletion in *Carrier II* )). We then added that "the jury was entitled to infer that Carrier intentionally and knowingly made the statements attributed to her and that *she intended that they be understood by others as a serious threat to the President." Id.* (emphasis added).

We do not read *Carrier II* as displacing *Compton* 's holding that it suffices for § 871 liability that a threat be made " 'under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President,' " *Compton,* 428 F.2d at 21 (quoting *Roy,* 416 F.2d at 877), with a new requirement that the speaker intend his threats to be taken seriously, whether or not a reasonable person would do so. As noted *supra,* this was not the issue presented to us by *Carrier's* contention that she could not be convicted because she had no plan to carry out her threats. Thus, *Carrier II's* statements regarding the defendant's intent that her threats be taken seriously may be regarded as dictum.

More fundamentally, *Carrier* was neither decided by the court in banc nor circulated to its active members before filing, and does not even mention *Compton.* It therefore cannot be regarded as overruling or displacing *Compton. See United States v. Moore,* 949 F.2d 68, 71 & n. 2 (2d Cir.1991) ("prior opinions of a panel of this court are binding upon us in the absence of a change in the law by higher authority or our own in banc proceeding (or its equivalent)"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1678, 118 L.Ed.2d 396 (1992).

We conclude that § 871 requires only a showing of general intent, and that the district court therefore properly excluded evidence of Johnson's diminished capacity with respect to counts one and three of the indict-

ment. *See United States v. Reed,* 991 F.2d 399, 400 (7th Cir.1993) ("[D]iminished capacity ... is a defense only to specific intent crimes.") (collecting cases); *United States v. Busic,* 592 F.2d 13, 21 (2d Cir.1978) ("the defense of a mental condition negativing the mental element required for the charged offenses" only available for specific intent crimes).

■ The language of § 879(a), upon which count two of the indictment is based, is substantially similar to that of § 871(a). Section 879(a) provides in relevant part:

> Whoever knowingly and willfully threatens to kill, kidnap, or inflict bodily harm upon-'
>
> (1) a former president ...
>
> . . . .
>
> who is protected by the Secret Service as provided by law, shall be fined not more than $1,000 or imprisoned not more than three years, or both.

Congress enacted § 879 in 1982. *See* Pub.L. No. 97–297, 96 Stat. 1317 (1982). By that time, § 871, originally enacted in 1917, *see* ch. 64, Pub.L. No. 319, 39 Stat. 919 (1917), had undergone over sixty-five years of judicial analysis and construction. As we stated in *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20 (2d Cir.1989):

> [I]t is generally presumed that Congress is (a) knowledgeable about existing laws pertinent to later-enacted legislation, (b) aware of judicial interpretations given to sections of an old law incorporated into a new one, and (c) familiar with previous interpretations of specific statutory language.

*Id.* at 25 (citations omitted); *see also Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978).

At the time Congress enacted § 879, the interpretation of the phrase "knowingly and wilfully" in § 871 that had been articulated in *Roy* and its progeny was widely accepted in the federal courts. The fact that Congress chose to adopt this and other substantially identical language in enacting § 879, which addresses a concern parallel to that engaged by § 871, bespeaks an intention to import the established general intent interpretation of § 871 into the new statute. *Cf. Bonanno,* 879 F.2d at 21–27 (holding that United States cannot sue for treble damages under RICO, reasoning that it could not do so under similar language of Clayton Act on which RICO was modelled). We accordingly conclude that § 879 requires proof only of general intent.

We recognize that, contrary to this conclusion, two courts that have considered this question have concluded that § 879 posits a specific intent crime, requiring proof that the defendant intended his statement to be perceived as a threat. *See United States v. Gordon,* 974 F.2d 1110, 1117–18 (9th Cir. 1992); *United States v. Kosma,* 749 F.Supp. 1392, 1401–02 (E.D.Pa.1990), *aff'd* 951 F.2d 549 (3d Cir.1991).[2] Both of these cases explicitly premised their analyses upon the House Judiciary Committee report accompanying the bill that enacted § 879. *See Gordon,* 974 F.2d at 1117; *Kosma,* 749 F.Supp. at 1401. That report stated, in relevant part:

> With regard to section 879, the Committee recognizes the need to protect the safety of protectees of the Secret Service and their ability to function free of fear. Moreover, the Committee recognizes the fundamental interests shared by all Americans in free and uninhibited speech, especially where public figures are concerned. Therefore, the Committee construes a threat that is "knowingly and willfully" made as one which the maker intends to be perceived as a threat regardless of whether he or she intends to carry it out. *A prosecution under this section would not only require proof that the statement could reasonably be perceived as a threat, but would also require some evidence that the maker intended the statement to be a threat.*

H.R.Rep. No. 725, 97th Cong., 2d Sess. 4 (1982) (emphasis added, footnotes omitted), *reprinted in* 1982 U.S.C.C.A.N. 2624, 2626

---

**2.** Because the government did not appeal the district court's interpretation of § 879, the Third Circuit "express[ed] no opinion as to the district court's interpretation." *Kosma,* 951 F.2d at 552 n. 4. The government also conceded the point at trial. *See* 749 F.Supp. at 1401 & n. 11.

(the "Committee Report"); *see also* 128 Cong.Rec. H21218 (daily ed. Aug. 16, 1982) (statement of Rep. Hall) ("Our [committee] report construes 'knowingly and willfully' as requiring proof of a subjective intent to make a threat.").

The language of the Committee Report provides hazardously uncertain guidance in interpreting § 879. While the Report would require *"proof"* that a defendant's statement could "reasonably be perceived as a threat," it would require only *"some evidence* that the maker intended the statement to be a threat." Committee Report at 4 1982 U.S.C.C.A.N. 2626 (emphasis added). This is a very confusing approach to the interpretation of a statute that imposes criminal liability. Whatever the elements of liability are defined to be, it is fundamental, indeed, constitutionally required, *see Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), that they must be proved beyond a reasonable doubt, not that "some evidence" may be presented with respect to them.

We do not consider this problematic legislative history sufficient to overcome the presumption that Congress intended to preserve the settled judicial interpretation of § 871 when enacting the parallel § 879 in language substantially identical to that employed in § 871. *Cf. Ratzlaf v. United States*, — U.S. —, — – —, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("There are, we recognize, contrary indications in the statute's legislative history. But we do not resort to legislative history to cloud a statutory text that is clear.") (footnotes omitted); *Connecticut Nat'l Bank v. Germain*, — U.S. —, —, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("Germain says that legislative history points to a different result. But we think that judicial inquiry into the application of § 1292 begins and ends with what § 1292 does say and with what § 158(d) does not."); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 528, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring in the judgment) (legislation should be interpreted on basis of meaning that is: (1) most in accord with context and ordinary usage likely to have been understood by entire Congress, rather than legislative history known to a relatively few members, and "(2) most compatible with the surrounding body of law into which the provision must be integrated").

We conclude that § 879, like § 871, requires only proof of a statement that a reasonable person would perceive as a threat, and accordingly that the district court properly ruled that evidence of diminished mental capacity should be excluded.

B. *The Refusal to Instruct the Jury Regarding Entrapment.*

■ After his initial June 28, 1991 statement, Johnson was interviewed on August 1 and August 20, 1991 by Secret Service agent Alan Kolwaite. Johnson argues that because of his alleged mental disorders, he was "particularly susceptible to being induced to utter the threats overheard by Agent Kolwaite," and that the repeated interviews by the Secret Service constituted entrapment.

■ In our view, however, the district court correctly declined to instruct the jury on entrapment. " '[A] valid entrapment defense has two related elements: government inducement of the crime, and lack of predisposition on the part of the defendant to engage in the criminal conduct.' " *United States v. Harvey*, 991 F.2d 981, 992 (2d Cir. 1993) (quoting *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988) (alteration in *Harvey* )). Even if a defendant makes a showing of inducement, a district court need not submit the matter of entrapment to the jury "[i]f the government's evidence of propensity [to commit the crime] stands uncontradicted." *United States v. Mayo*, 705 F.2d 62, 68 (2d Cir.1983), *overruled on another ground, Mathews*, 485 U.S. at 59 n. 1, 62, 108 S.Ct. at 884 n. 1, 886.

Johnson's unsolicited June 28th statement to a therapist clearly demonstrates that he "was disposed to commit the criminal act prior to first being approached by Government agents," *Jacobson v. United States*, — U.S. —, —, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992), and thus establishes predisposition. Johnson has cited nothing in the record to the contrary. Accordingly, the dis-

trict judge properly declined to instruct the jury on entrapment.

## C. *The Admission of Evidence Regarding Prior Bad Acts.*

■ The government elicited a number of statements regarding Johnson's prior bad acts from defense expert witnesses whom Johnson had called to offer testimony concerning Johnson's insanity defense, and from two psychologists called by the government as rebuttal witnesses. The testimony concerned Johnson's prior acts of burglary, armed robbery, rape, and forcible sodomy, his prior escapes from psychiatric hospitals, and various crimes that he allegedly committed while in prison. Johnson argues that the admission of this evidence was unduly prejudicial and deprived him of a fair trial.

The government responds that the evidence was properly admitted to rebut defense testimony regarding Johnson's insanity defense. We agree. Johnson asserted that he was suffering from auditory hallucinations, and that the voices he heard compelled this conduct. The evidence that the government elicited tended to establish that Johnson appreciated the wrongfulness of his actions, and that he was not merely responding to auditory hallucinations. It was therefore directly relevant to the issue of Johnson's sanity. *See United States v. Bradshaw*, 935 F.2d 295, 301 (D.C.Cir.1991); *United States v. Medved*, 905 F.2d 935, 939 (6th Cir.1990), *cert. denied*, 498 U.S. 1101, 111 S.Ct. 997, 112 L.Ed.2d 1080 (1991); *United States v. Hauck*, 586 F.2d 1296, 1299 (8th Cir.1978), *cert. denied*, 441 U.S. 947, 99 S.Ct. 2170, 60 L.Ed.2d 1050 (1979).

■ For example, a psychologist called by the defense testified on cross-examination that Johnson had used an accomplice in committing a rape, and conceded that persons suffering from auditory hallucinations would not normally be able to do so. Similarly, a government psychiatrist recounted that Johnson had begun wearing a mask to conceal his identity after he had been apprehended for prior rapes, which the psychiatrist testified was an indication that Johnson appreciated the wrongfulness of his actions. This witness also testified that Johnson had a history of feigning mental illness to avoid responsibility for his crimes. This evidence was directly relevant to Johnson's sanity at the time he made the statements at issue in this litigation. Once Johnson raised the insanity defense, the government was properly allowed to "present[ ] the basis for the contrary opinion of its own expert," *United States v. Bell*, 500 F.2d 1287, 1290 (2d Cir. 1974), as well as to expose facts inconsistent with the opinion of the defense experts.

■ In any event, the prior bad acts evidence was not so prejudicial as to deprive Johnson of a fair trial. Because Johnson did not contest making the statements at issue, there was "no risk of the primary prejudicial effect of prior convictions, that the jury will 'prejudge [a defendant's] guilt on the basis of his past criminal record, because [the defendant does] not deny commission of the act.'" *Bradshaw*, 935 F.2d at 302 (quoting *Rogers v. United States*, 483 A.2d 277, 288 (D.C.App. 1984), *cert. denied*, 469 U.S. 1227, 105 S.Ct. 1223, 84 L.Ed.2d 363 (1985)) (alterations in *Bradshaw*); *see also Medved*, 905 F.2d at 939. The court admonished the jury that evidence of prior crimes was not to be considered as evidence of guilt in this case during the voir dire. The court also gave curative instructions both immediately following the cross-examination in which the government first elicited the evidence of prior bad acts, and during the final jury charge. We therefore conclude that the district court did not abuse its discretion in admitting this testimony into evidence. *See Hauck*, 586 F.2d at 1299 ("In analyzing [the issue of admitting prior bad acts evidence to rebut an insanity defense, a] court must give great deference to the trial court.").

## D. *The Sufficiency of the Evidence.*

■ Johnson contends that there was not sufficient evidence from which a rational jury could find him guilty beyond a reasonable doubt. This argument is without merit. There was no question whether Johnson made the statements in question. The only relevant question was whether Johnson was sane at the time he made the statements. The government presented two psychiatric experts who testified that Johnson was able

to appreciate the quality and wrongfulness of his acts; the defense presented two experts who testified to the contrary. The alleged shortcomings of the government experts were at most matters of weight and credibility for the jury to resolve. We conclude that there was abundant evidence from which a rational factfinder could conclude beyond a reasonable doubt that Johnson was sane at the time he made the threats for which he was indicted. *See United States v. Chang An–Lo,* 851 F.2d 547, 554 (2d Cir.) ("If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be sustained.") (collecting cases), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988).

### Conclusion

The judgment of the district court is affirmed.