917 F.2d 564
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
KENNETH ROBERT HOLLEY, ROBERT AARON WILEY, and PAMELA
MECHELE SCHOLES, Defendants-Appellants.
 Nos. 89-6516, 89-6520 and 89-6517.
 United States Court of Appeals, Sixth Circuit.
 Nov. 1, 1990.
 
 Before NATHANIEL R. JONES, RYAN and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant-appellants Robert Wiley, Kenneth Holley and Pamela Scholes appeal their convictions and sentences for possession, distribution and use of a firearm in connection with the distribution of marijuana. For the reasons set forth below, we affirm.
 
 I.
 
 2
 The arrest of Wiley, Holley and Scholes on March 17, 1989 was the culmination of a reverse sting operation conducted by the Hamilton County Sheriff's Narcotics Division. Prior to the night of the arrest, undercover officers had met with Scholes on three occasions. On the first occasion, February 25, 1989, Scholes sold Detective Hamby one ounce of marijuana for approximately $120.00. On March 7, 1989, Scholes sold Detectives Hamby and Eberhart 1/4 pound of marijuana for $350.00. On March 10, Scholes again met with Hamby and Eberhart and sold them 1/2 pound of marijuana for $650. During the course of this conversation, which the officers taped, Scholes said she could supply as much as 500 pounds of marijuana. During this conversation, Eberhart and Hamby arranged to purchase 50 pounds of marijuana from Scholes on March 16. Officers Hamby and Eberhart testified that Scholes said that when the marijuana was delivered, someone else would be with her and that a van would be required to bring such a large quantity of marijuana. J.App. 95. The deal was later rescheduled to take place on March 17 at an interstate welcome center and rest stop on I-24 just across the Tennessee line from Georgia.
 
 
 3
 On March 17, Eberhart met Scholes at the parking lot behind the Tennessee welcome center. Wiley was present during the initial meeting between Scholes and Eberhart that evening but remained in his van. Detectives at that time did not know who Wiley was, but they had anticipated that he must be with Scholes because of her prior statement that her accomplice would be in a van. The testimony conflicts as to how far from Scholes' car the van was parked, but it appears to have been between six and seven parking spaces away.
 
 
 4
 Scholes got into Eberhart's car and tried to convince him that they should complete the deal in Georgia. Her partners were apprehensive about bringing the marijuana into Tennessee because they had been previously ripped off in Tennessee for $75,000 and didn't want to take any chances. J.App. 100. Eberhart then paged Hamby, who had been parked at another rest stop, and Hamby arrived with the money. Once Scholes had seen and counted the money, she agreed to conduct the deal in Tennessee. However, she informed Eberhart that they had only forty-six pounds instead of fifty and deducted $3700 from the $47,000 purchase price. Id. at 101.
 
 
 5
 Just prior to Wiley's arrival at the welcome center, he was seen meeting with Holley at another location. Holley had been waiting for Wiley and, upon his arrival, Holley joined Wiley in the van and they took a short drive. They were together approximately ten minutes and then Wiley proceeded to the welcome center. Holley drove toward the welcome center in a separate car and stopped at a gas station until he was called.
 
 
 6
 After talking to Eberhart and agreeing to go ahead with the deal, Wiley and Scholes left. Later all three defendants reappeared at the welcome center within a few minutes of each other. When Holley arrived at the center he left his car and went inside the center. Scholes then went and opened the trunk of Holley's car to reveal two large garbage bags full of marijuana. Holley meanwhile got into the passenger seat of Wiley's van. Wiley was seen to be wearing headphones when Holley got into Wiley's van.
 
 
 7
 About the time Holley got into Wiley's van, Scholes was arrested. Officers then approached the van and ordered Wiley and Holley to surrender themselves. Both Wiley and Holley hesitated, but finally agreed to surrender. Officers then entered the van and discovered numerous firearms including an assault rifle ("AR15"), four AR15 magazines, a .25 caliber pistol and a .22 magnum pistol along with a box of shells behind and to the right of the driver's seat in the back of the van. Between the driver and passenger seats the officers found a .45 caliber automatic. Police also found a stun gun and other weapons.
 
 
 8
 When police placed Holley on the ground, a .25 caliber pistol fell from his right pocket. The weapon was kicked away by a police officer, but was recovered and examined. While a police officer testified that at the time of arrest the gun was loaded and operable, at trial the trigger had come loose and the gun would not work. The police were unable to explain how the trigger happened to later come out of the firearm.
 
 
 9
 The police also recovered the headphones which Wiley was wearing while Scholes was talking to detectives. An identical set of headphones were found in Scholes' car indicating that Wiley had been monitoring the transaction going on in Scholes' car.
 
 
 10
 On July 13, 1989, defendants Wiley, Holley and Scholes were charged in a three-count indictment. Counts I and II involved conspiring to illegally distribute marijuana and possession with intent to distribute marijuana, in violation of 21 U.S.C. Secs. 846 and 841(a)(1). Count III charged defendants with using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. 924(c)(1) and (c)(2). All three defendants pled not guilty and a jury trial began on August 29, 1989. After three days of trial, the jury returned a verdict of guilty on all counts for all defendants.
 
 
 11
 On November 6, 1989, defendant Wiley was sentenced to a total of ninety-three months and ordered to pay a fine of $6,150.00, including a $50.00 special assessment on each of the three counts. Defendant Holley was sentenced to 30 months on each of Counts I and II with sentences to run concurrently, as well as five years of supervised release. On Count III, Holly was sentenced to 60 months to run consecutive to the other sentences and three additional years of supervised release to run concurrently with the other supervised release. Defendant Scholes was sentenced to 24 months on each of Counts I and II with sentences to run consecutively, and five years of supervised release. On Count III, Scholes received a 60 month sentence to run consecutive to the other sentences and three years of supervised release to run concurrently with the other supervised release.
 
 
 12
 All defendants appeal the sufficiency of the evidence as to Count III. Holly appeals the district court's refusal to grant him an acceptance of responsibility reduction and claims that his base offense level was improperly calculated because the court erroneously determined the quantity of marijuana. Wiley appeals the sufficiency of the evidence to convict him on all counts and asserts that the trial court erroneously admitted hearsay testimony which resulted in prejudicial error.
 
 II.
 
 13
 As their first assignment of error, all the defendants contend that the evidence was insufficient to convict them of using or carrying a firearm in connection with a drug trafficking crime. The standard of review for an insufficiency of the evidence claim is whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Martin, 897 F.2d 1368, 1373 (6th Cir.1990) (quotations omitted).
 
 
 14
 Possession of a firearm in connection with a drug trafficking offense can be actual or constructive. United States v. Acosta-Cazares, 878 F.2d 945, 951-52 (6th Cir.) cert. denied, 110 S.Ct. 255 (1989). Further, it is well established that a weapon need not be brandished or displayed in order to support a conviction under 18 U.S.C. Sec. 924(c).[1] Id. This court has also said that the words "uses" or "carries" in Sec. 924(c) should be construed broadly to cover the gamut of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions. Id. at 952 (citations omitted). In addition, under the Pinkerton doctrine, a defendant may be convicted under Sec. 924(c) if a co-conspirator used or carried a weapon in connection with the drug trafficking offense. United States v. Diaz, 864 F.2d 544, 548 (7th Cir.1988) (citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)).
 
 
 15
 Against this legal backdrop, there was clearly sufficient evidence to convict all of the defendants under Sec. 924(c). The evidence linking Wiley and Holley to the guns is quite strong. Wiley was seen wearing headphones to monitor the conversation between Scholes and Eberhart and Hamby. Numerous weapons were found in Wiley's van within easy reach of both Wiley and Holley. A .45 caliber semi-automatic pistol was found between Wiley and Holley's seats. Holley, having arrived at the welcome center in his own car, entered Wiley's van and waited while the drug transaction was taking place. Finally, when Holley was removed from the car, a .25 caliber pistol fell out of his pocket.
 
 
 16
 Wiley asserts that during his arrest, the police officers removed all the weapons from the back of the van and then later placed the weapons back in the van directly behind the driver's seat. He relies on cross-examination testimony from one of the police officers that when the weapons were re-placed in the van they were placed closer to the seat and that the evidentiary photo was taken at such an angle so as to make the distance between the guns and the seats appear closer. J.App. 148. Wiley also offered testimony from a Georgia police officer who testified that Georgia law permitted the carrying of firearms in one's car, that Wiley was licensed to carry firearms and that Wiley had a gun collection. Defendant Wiley's Brief at 5 (citing the trial record).
 
 
 17
 While the distorting effects of the photo may have some evidentiary value and the fact that Wiley was licensed to carry firearms in Georgia suggests that under lawful circumstances, Wiley could carry weapons, this evidence does not cast doubt on the government's case. Wiley clearly had access to the guns whether they were in the back of the van or closer to the seat. Further, the .45 caliber gun was found directly next to the driver's seat. Finally, the other evidence linking Wiley, Holley and Scholes in the drug conspiracy seems more than sufficient for the jury to infer that Wiley and Holley were at the welcome center with the weapons in order to protect the drug transaction.
 
 
 18
 Holley makes much of the fact that the weapon that fell from his pocket when he was arrested did not work at trial. However, the government put on testimony that the gun was loaded and fully functional at the time of arrest. 18 U.S.C. Sec. 921(a)(3) defines a firearm in relevant part as "(A) any weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon." Thus, it is irrelevant under the law whether the gun was operable at the time of the offense if it was designed to be a firearm. Cf. United States v. Medved, 905 F.2d 935, 940 (6th Cir.1990) (toy gun qualifies as a dangerous weapon under 18 U.S.C. Sec. 2113).
 
 
 19
 Defendant Scholes argues that since it was not reasonable for her to foresee that Wiley and Holley would have weapons to protect the drug deal, she should not be held responsible for the use of the weapons by her co-conspirators under the Pinkerton doctrine. See Pinkerton, 328 U.S. at 646-47. While the Pinkerton doctrine allows as a matter of course that all crimes committed in furtherance of a conspiracy may be attributed to all co-conspirators, it provides an exception to this normal rule if a particular act done in furtherance of the conspiracy could not have been reasonably foreseen as a necessary and natural consequence of the conspiracy. Id.
 
 
 20
 Scholes' invocation of the foreseeability exception to the Pinkerton doctrine must fail in light of the evidence. The conspiracy was set up to have three participants, one to negotiate, one to bring the marijuana, and one to act as enforcer. Scholes said that she would be accompanied by a van on the night of the deal. She expressed concern about having the deal in Tennessee because her partners had been ripped-off for $75,000 in a prior deal in Tennessee. Further, it was reasonable for the jury to have found that she knew Wiley was monitoring her conversation through the headphones and that he was there to protect the drugs and the money. Finally, Scholes did not seem to be new to the drug trafficking trade and the jury could have reasonably inferred that she would expect that in a deal involving 46 pounds of marijuana and $47,000 that weapons would be involved. Thus, we find that the evidence supports a jury inference that Scholes could have reasonably foreseen that Wiley and Holley would have guns.
 
 
 21
 We therefore find that the evidence was sufficient to convict all the defendants under Sec. 924(c).
 
 III.
 
 22
 The second issue on appeal is whether the court erred in calculating Holley's sentence. Holley contends that the court erred in failing to grant him a reduction in his base offense level for acceptance of responsibility, and that the court improperly calculated the weight of the marijuana in establishing the base offense level.
 
 
 23
 A. Acceptance of responsibility.
 
 
 24
 The Sentencing Guidelines provide for a two-level reduction in a defendant's base offense level for acceptance of responsibility "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." U.S.S.G. Sec. 3E1.1(a). A district court's failure to grant a reduction for acceptance of responsibility should not be disturbed on appeal unless it is clearly erroneous. See United States v. Fleener, 900 F.2d 914, 917 (6th Cir.1990).
 
 
 25
 Holley contends that he was entitled to a reduction primarily on the theory that since he, as a matter of trial strategy, more or less admitted his involvement in Counts I and II, while strongly contesting his guilt in Count III, a reduction should have been granted on Counts I and II.
 
 
 26
 The issue of a two-level reduction for acceptance of responsibility was briefed by both parties. From the briefs, it appears that the court weighed the fact that Holley never withdrew from the conspiracy, had to be arrested rather than voluntarily surrendering, was uncooperative, and never made any truthful admission to the authorities of his involvement in the offense. Further, Holley always maintained that he was not guilty on Count III. While a plea of not guilty does not preclude a finding of acceptance of responsibility, it may be taken into account as one of the factors in determining whether to grant a reduction. Cf. Fleener, 900 F.2d at 918.[2] The defendant bears the burden of demonstrating his acceptance of responsibility. United States v. Christoph, 904 F.2d 1036, 1040 (6th Cir.1990), No. 90-5535, petition for cert. filed August 23, 1990. In light of the facts before the court, we find the court's refusal to grant Holley a reduction for acceptance of responsibility was not clearly erroneous.
 
 
 27
 B. Calculation of the weight of the marijuana for sentencing.
 
 
 28
 Holley also contends that he was entitled to a base level of 16 rather than 18 because the total weight of the marijuana was under 20 kilos. Section 2D1.1 of the Sentencing Guidelines provides for an offense level of 18 when the quantity of marijuana is more than 20 but less than 40 kilos. In this case, the government put on testimony from the forensic chemist who analyzed and weighed the marijuana. She testified that the weight of the two bags of marijuana was 45.5 pounds (20.68 kilos). This weight was calculated three days after the arrest. Seven months after his arrest, defendant was permitted to weigh the drugs. His expert determined that the marijuana weighed 19.2 kilos. Thus, he argues that the proper base level was 16 as the defendant should not be charged with the weight of the moisture contained in the marijuana. Both the government and defendant agree that the drying out of the marijuana from the time of arrest to the time of Holley's weighing accounts for the difference in weight.
 
 
 29
 The government argues first, that the actual weight of the drugs is irrelevant in a conspiracy charge. The government cites Section 2D1.4 of the Sentencing Guidelines which provides that the base level for a conspiracy involving a controlled substance is "the same as if the object of the conspiracy or attempt had been completed." The Application Note to Section 2D1.4 provides that "[i]f the defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." U.S.S.G. Sec. 2D1.4, n. 1. Therefore, in a conspiracy case, like the one at bar, it is not the actual amount but rather the negotiated amount which determines the base level. See United States v. Rodriguez, 896 F.2d 1031, 1033 (6th Cir.1990). Thus, the government asserts that the court was not clearly erroneous in finding that the weight of the drugs was over 20 kilos for all defendants when the negotiated amount was more than that.
 
 
 30
 The government also argues that even if the base offense level was determined on the actual weight it was not clearly erroneous for the judge to accept the weight offered by the forensic chemist taken three days after the arrest rather than the weight calculated by Holley's expert taken seven months later. Defendant argues that the bags contained stems and seeds and other parts that should not have been weighed. He also contends that the moisture in the marijuana should not be included in the weight. However, Holley has not produced any evidence to suggest that the bags contained anything but marijuana. Further, had the defendants sold the marijuana to individual purchasers, they would not have deducted the moisture weight from the price.
 
 
 31
 In our view, the court properly found that the weight of the marijuana for sentencing purposes was in excess of twenty kilos. As the defendants negotiated to sell over twenty kilos and the forensic expert found the weight to be over twenty kilos, it was not clearly erroneous for the judge to sentence Holley based upon an amount over twenty kilos.
 
 IV.
 
 32
 The third issue on appeal involves whether there was sufficient evidence to convict defendant Wiley on all counts. We have already addressed the question of whether the evidence was sufficient to convict on the weapons charge in Part II. As to the conspiracy and possession charges, Wiley contends that he should not have been convicted because he was not found with any marijuana and that there was insufficient evidence to establish a conspiracy.
 
 
 33
 We find Wiley's arguments here frivolous. The evidence which supported his conviction included the fact that Wiley was at the welcome station both when Scholes met with Eberhart and Hamby and returned there again when Holley came to deliver the drugs; that Wiley was seen wearing headphones which matched the headphones in Scholes' car indicating that he was monitoring her conversation with Eberhart during the drug deal; that prior to the attempted drug sale, Wiley was seen with Holley who had the marijuana in his car at a nearby rest area; that Wiley and Holley conversed at the rest area and drove around for some minutes before driving to the welcome center in separate cars; and that when Holley arrived at the welcome center he left his car, and joined Wiley in the van. This evidence is more than sufficient to support the conspiracy charge and the charge for constructive possession of the drugs.
 
 
 34
 Wiley also challenges the admission of the evidence regarding Scholes' prior out-of-court statement that her accomplice would be driving a van (See infra Section V), but even without that testimony, there is still enough evidence which, if examined in the light most favorable to the government, supports Wiley's conviction. Therefore we find there was sufficient evidence to convict Wiley on all counts.
 
 V.
 
 35
 Finally, Wiley asserts that his conviction should be reversed because the trial court improperly admitted Scholes' out-of-court statement that her accomplice would be driving a van. The basis of his argument is that the court improperly admitted the evidence as a statement in furtherance of a conspiracy under Fed.R.Evid. 801(d)(2)(E).[3]
 
 
 36
 The government argues that Scholes' statement to Detective Hamby at one of their earlier meetings on March 10, 1989 was made in furtherance of the conspiracy. This was the meeting at which Scholes agreed to sell Hamby and Eberhart the 50 pounds of marijuana that was the basis for this sting operation. It was also the date named in the indictment as the first date of the conspiracy.
 
 
 37
 The essence of Wiley's argument seems to be that the court erred in admitting the evidence before determining that a conspiracy was established. When Detective Hamby testified about his conversation with Scholes, Wiley's defense counsel objected. The court heard counsel at the bench and determined that he would admit the testimony pending a determination that there was in fact a conspiracy. Wiley's counsel argued that the prejudice of the hearsay would already have occurred if a conspiracy was not proved and argued that permitting such evidence violated Wiley's confrontation right under the sixth amendment.
 
 
 38
 While the court never made specific findings on this issue, we find that the evidence was more than sufficient to establish the conspiracy. Thus, Fed.R.Evid. 801(d)(2)(E) would apply in this instance. In Bourjaily v. United States, 483 U.S. 171, 181-82 (1987), the Court held that admission of a co-conspirator's statement which meets the requirements of Rule 801(d)(2)(E) does not violate a defendant's sixth amendment confrontation right. Thus, we find that the court's admission of Scholes' out-of-court statement was proper. See United States v. Enright, 579 F.2d 980 (6th Cir.1978).
 
 VI.
 
 39
 The judgement of the district court is hereby AFFIRMED as to all three defendants.
 
 
 
 [1]
 924(c)(1) provides in relevant part, "Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years...."
 
 
 [2]
 Compare United States v. Watt, No. 88-3092 (9th Cir. August 6, 1990). In Watt the Nineth Circuit held that a defendant's constitutionally protected pre- or post-plea conduct may not be considered in deciding whether to grant a reduction for acceptance of responsibility. The district court had relied on the fact that the defendant had not voluntarily surrendered to the authorities or assisted in recovering stolen money, both factors listed in the commentary to Section 3E1.1. On appeal the court concluded that the trial court could not penalize the defendant for constitutionally-protected activity like requesting counsel, relying on the privilege not to make incriminating statements to the police, or failing to assist the police in producing incriminating evidence
 
 
 [3]
 Fed.R.Evid. 801(d)(2)(E) provides:
 (d) Statements which are not hearsay. A statement is not hearsay if--
 (2)(E) The statement is offered against a party and is ... a statement made by a co-conspirator of a party during the course and in furtherance of a conspiracy.