**UNITED STATES of America,**

v.

**Paul MARINO, Defendant.**

**Nos. 95 CR 0097–02, 95 CR 0571–01.**

United States District Court,
E.D. New York.

Jan. 18, 2001.

Loretta E. Lynch, United States Attorney, Eastern District of New York, Brooklyn, NY, by Leonard Lato, Assistant United States Attorney.

Raymond M. Grunewald, New York City, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In view of the seriousness of the charge—a threat against the President of the United States—and the length of the hearing, the Court thought it appropriate to issue a full written opinion.

In the continuing Marino—Amato saga, this is the second Violation of Supervised Release charge against the defendant Paul Marino. In this proceeding, he is charged with sending an e-mail message to Mayor Rudolph Giuliani, which threatened the lives of Mayor Giuliani and President Clinton in violation of 18 U.S.C. § 871(a). The letter reads as follows:

hey rudy,

Let me voice my opinion

I think you are a scum bag of the worst order. In fact I feel so strongly about it that I may take out my pistol and kill you along with that fuck bill clinton, strunzio pesident [sic] that he is. I hate you both I want you both dead. Now I have the cunt wife as a neighbor. I DON'T LIKE IT ... Die you fucks die. See you in hell Rudy, when Billy clinton comes to stay in his new home here, I'm gonna sneak around that fucking house and launch a rocket straight into his bedroom. Don't think I can't do it. I've got the money for it and the fucking balls. I have nothing to live for anymore fuck you all!!!!!!

giulia amato

giulia *amato@onebox.com*—email

(212) 894–3702 x2601—voicemail/fax

70 rebeca Lane

carmel, ny

The e-mail at issue (Govt.Ex. 5) is difficult to read, but the message can be discerned. It is also difficult to make out the date and time the e-mail was sent and received. However, close reading reveals that the message was sent on February 26, 2000 at 12:52:35 p .m. (Pacific Standard Time ["PST"]). Apparently, the message was delivered from onebox.com to another relay at onebox.com on February 26, 2000 at 12:52:35 p.m. (PST) and was delivered to Mayor Giuliani's office on February 26, 2000 at 15:55:08 (3:55:08 p.m.) (Eastern Standard Time).

The Government presented the following evidence. Adam J. Melzak is a technical support supervisor for Monmouth Internet Corp. of Redbank, New Jersey ("Monmouth Internet"). On October 6, 1999, his company issued a New Account Report (Govt.Ex. 1) listing a new subscriber, Paul Marino of 61–30 166th Street, Queens, New York 11365, telephone number 718–353–1880. Marino had a username of cmb839 with a password unique to the username, vick*kusa or bick*kusa. According to a Monmouth printout (Govt.Ex. 2), the starting date for the Paul Marino account was October 6, 1999 and the account was in continuous operation to the end of service on October 1, 2000.

One needs to know the username and the password to get access into the system. On March 6, 2000, Marino called to change his username to spyrogyra (see Govt. Ex. 3). It is the username which is on the e-mail, not the password, which is kept secret. However, to log into the sys-

tem, one has to know the password in addition to the username.

According to the Monmouth Internet records, on Saturday, February 26, 2000 at 15:32, Marino connected to the Monmouth system. On Saturday, February 26, 2000 at 19:51:39, Marino disconnected from the system. There were no interruptions in service, so that, according to the records, Marino logged on continuously for approximately four hours and twenty minutes. On page two of the Monmouth log (Govt.Ex. 4), there was a second log in. On February 26, 2000 at 15:35:07, user cmb839 logged on until 15:46:56. Apparently, at least for some period of time, the person or user was connected on two phone lines.

There was a unique internet protocol ("IP") address for each and every call. The IP address is a unique identifier of a particular computer that is connected to the internet at the time of connection. The calls referred to above had the same IP address. This was a multi-link account (two modems hooked up to one computer with two separate phone lines). The defendant had such a multi-link account. The two calls were placed from the same computer because they issued the same IP address.

The witness was then shown the e-mail at issue (Govt.Ex. 5). Before the words of the actual e-mail which starts with the words "hey rudy," technical information unrelated to the message is set forth. There is a Monmouth Internet IP address of 209.191.41.121. Melzak testified that the person sending this e-mail "had to be from a Monmouth Internet dialing account ... someone dialed into Monmouth Internet at the same time the e-mail is being sent" (Tr. at 45).[1] According to Melzak, the person reflected in the Monmouth log is the person who sent the e-mail.

On cross-examination, Melzak conceded that none of the records in evidence can show the specific computer that sent the message. Also, Melzak was questioned about someone using a laptop and tapping into the Marino telephone line from a box located at the side of the house.

BY MR. MARINO:

Q  If I dialed from my machine to Monmouth on the multilink account, those IP addresses on my machine would show the same, correct?

A Yes.

Q  If someone used a palm pilot or a laptop or whatever, hooked into the same phone lines from the side of my house or sitting in a parked car in front of my house, using my accounts, my phone line, not my computer, would the same exact information apply?

A With you not on?

Q  With my machine not on it, my machine using my account, my Monmouth account which we established today, my phone line tapped into the side of my house, would that information show the same IP information?

A Yes.

MR. MARINO:  Thank you.

(Tr. at 59.)

United States Probation Officer Richard L. James is supervising the defendant. Upon receiving the news about this e-mail, he and Supervising United States Probation Officer David J. Washington interviewed the defendant on March 8, 2000 and questioned him about the e-mail at issue. The defendant denied sending the e-mail and stated that someone could have tapped into his computer and/or phone mail system and sent the message. However, the defendant never stated he was not at home at the time.

James subpoenaed the Verizon records and received a document (Govt.Ex. 6) which showed, among other things, two telephone numbers that were the defendant's home phone numbers. From the records received, it appears that on February 26, 2000 at 3:38 p.m., a phone call was

---

1.  Tr. refers to the Hearing Transcript dated December 15, 2000.

placed from each of the telephone numbers to Monmouth Internet.

Probation Officer James spoke with the secret service agents who investigated this occurrence. The agents inspected the defendant's computer equipment. They told James that "they actually felt he sent the message but they didn't think it was a viable threat" (Tr. at 76). James did not recall if, as a result of their search, the agents found any evidence that would link the defendant to the e-mail. However, he conceded that the agents did not tell him that they found any incriminating evidence against the defendant. Marino told the agents that "maybe they should contact the Amato family."

James also testified that he heard the Monmouth representative testify that the e-mail message could have come from a telephone line or lines from the defendant's home and not from his computer.

In his Violation of Supervised Release Report, Probation Officer James stated that the defendant's adjustment to supervision was poor and that he was "manipulative and deceptive and continues his criminal behavior." However, James based his comment on the investigation that revealed that Marino in fact sent the e-mail message to Mayor Giuliani. Also included in this opinion by James is that Marino tried to hide his addresses and had some problem with his employment with the Bazzini Food Service, owned by his mother. However, James conceded that Marino was trying to be engaged in gainful employment.

At this point, the Government rested.

In the defendant's case, Keith Smidt, an employee of Verizon, testified as to the two telephone number records listed to Joan Marino at 61–30 166th Street, Fresh Meadows, New York. In particular, Smidt testified as to certain telephone calls made on February 25, 2000 and February 26, 2000. On one of the records (Dft.Ex. 6), there is a reference to "tapping." Smidt explained that was the customer's termi-

nology "for what he was experiencing" (Tr. at 99–100). Marino told someone from Verizon (or Bell Atlantic, its predecessor) "that there was a tapping on the line." In this regard, Smidt testified as follows:

Q There was some indication that he was suffering from wiretapping? Is that what you are saying?

A He just told the person he was speaking to on the phone that there was a tapping on the line.

Q Exhibit 6—C–6, 2620 exchange, same exchange. And the call indicates possible theft of service, and then it says an ampersand saying outdoor. Can you tell us what that translates to?

A It would mean that the customer's line was open at one of our boxes somewhere outdoors.

Q You mean some possible tampering?

A Correct.

(Tr. at 100.)

However, the test equipment of the phone company was coming up with a fault, meaning the line could not be tested in that there was an interruption on the line. In the report there was never any finding of trouble on the phone lines or that in fact somebody was tapping into either of those two phone numbers.

Gregory Blaha is a senior systems engineer. He manages a team of engineers involved in data communications at St. John's University. Blaha is an expert in computer engineering and computer hardware with extensive qualifications in this field. Blaha was retained by the attorney for the defendant to give expert testimony in the field of computers and e-mail technology as related to the facts in this case. Blaha reviewed the records in evidence and the violation of supervised release report. He also inspected the defendant's computer equipment and the telephone access equipment located in the external north side of the defendant's residence.

Comparing the Monmouth Internet records and the Verizon records as to the times of the phone calls, Blaha was con-

cerned about the validity of the Monmouth record log with regard to the discrepancy as to the times of the calls. Also, he found no record by Monmouth indicating that the call at issue actually originated from the activity on Marino's computer. "I don't see any proof here that Marino's computer actually did originate the message" (Tr. at 123).

Important to this Court's determination is Blaha's testimony as to his visit to the Marino residence. Blaha visited the Marino residence on November 11, 2000, and inspected the telephone equipment installed on the north wall of Marino's residence. Blaha told the Court that he observed a box attached to the wall of Marino's house at approximately chest level. In Blaha's opinion, the box could be opened effortlessly, and an individual could easily put a device into the box and then make a call on Marino's telephone line. Blaha also said that a person with limited knowledge could "hack into" two telephone wires with a box and two clips bought at Radio Shack for $8.44, two "devices" that cost $17, a laptop, and two modems.

Blaha brought this equipment with him to court and demonstrated how to tap into two telephone wires:

> So, what one would do is they would walk up to the side of the house. They would pop open the box. You can do it with a quarter. You connect this connector to the red wire in the box and the green connector to the green wire in the box. You do it twice. In the case of a telephone line there is [sic] two red wires and two green wires. And you just leave it hanging at the side of the house.
>
> You plug this wire into this box and let it hang.
>
> You walk out to your vehicle or wherever you think is a concealed location, and you plug into your laptop, which is already powered up. And if you know the user credentials, the user name and password, you are ready to go. You can issue an E-mail, close down your laptop

and get out of there in under five minutes, under four minutes.

(Tr. 124–129.) In response to the Court's questions, Blaha testified that someone could send an e-mail to Mayor Giuliani using the plug Blaha had just described (Tr. 128–29).

After his review of the records in evidence and his inspection of the Marino computer equipment and the exterior phone apparatus, Blaha came to the following conclusions regarding whether Mr. Marino's computer initiated the e-mails in question:

> A My conclusion was that the exhibits and the evidence that I examined showed that indeed Mr. Marino's account originated the E-mail. I was not totally convinced that the phone line originated the E-mail due to the discrepancy and the timing differentials, and I was not at all convinced that his actual computer initiated that E-mail.
>
> Q Were you present during the testimony by the gentleman from Monmouth Internet?
>
> A Yes.
>
> Q And you heard what he testified to?
>
> A Excuse me?
>
> Q You heard what he testified to?
>
> A Yes.
>
> Q Do you have any disagreements in particular with some of his testimony?
>
> A The only disagreement I have—I am not sure it is a disagreement, but I would like to clarify if someone had indeed tapped into the line—to the phone line on the side of the house and issued this E-mail from a laptop computer, the resulting information in Monmouth's log would be exactly the same. There would be no difference.
>
> Q And in your summary you said there is a lack of evidence proving Mr. Marino's computer originated the E-mail in question is that correct?
>
> A Yes.

Q And you said you found discrepancy in the information provided by Bell Atlantic and Monmouth?

A Yes. I found a timing difference.

\* \* \* \* \* \*

Q And it is easy to tap into a telephone?

A Extremely.

Q You have demonstrated it?

A Yes.

I say that—I basically summarize that the investigation that I performed, and the documents that I looked at, and in considering the interviews that I conducted with Mr. Marino, left me with the impression that his explanation being—I should not use that word, but the possibility of tapping was certainly there. It is plausible. It is a very conceivable event.

(Tr. at 135–138.)

During cross-examination it was brought out that Marino told Blaha "that individuals who have knowledge of his Monmouth Internet connections also have motive to harm him," and Blaha placed this information in his report. Of course, Blaha knows nothing about that factual situation. In sum, Blaha's testimony is that "it is *possible* that a person tapped into Mr. Marino's phone at 3:32 in the afternoon, ran a line to the car, spent several minutes there, and dialed up Monmouth" (Tr. at 148) and that this person had two modems (or one modem) in his laptop. He also conceded that "it is also possible that Mr. Marino sent this message" (Tr. at 194).

Michael Graffeo is employed by the Board of Education of the City of New York as a school custodian engineer. He has been employed by the Board of Education for 26 years. He has been working at George J. Bryan Junior High School for four years. In his position, he oversees the entire custodial operation, making sure the building is open, with regard to heating and that "children are being cared for in the proper manner in the school building." Graffeo supervises six employees and a secretary.

Graffeo knows Paul Marino. In a chance meeting at a coffee shop, where the subject of computers arose, Marino gave Graffeo his business card and asked Graffeo to call him "if you need anything about a computer in the school." Graffeo later called Marino and found him to be an expert on computers. Thereafter, Marino performed computer services for the school, submitted bills dated December 6, 1999 and June 21, 1999, and was paid $2,753.00 (Dft. Exs. I–1 to I–3). Graffeo was overwhelmed by Marino's work with computer systems. He felt the defendant was "almost a computer genius type."

Significantly, on Saturday, February 26, 2000, the day the e-mail at issue was sent, Marino performed computer services at the Bryan Junior High School. The work involved a system tune-up because the school's computer system had crashed (see invoice at Dft. Ex. J). Graffeo testified that the defendant was at the school on Saturday, February 26, 2000, when there would be no children in the school. He arrived at about 9:00 a.m. and stayed until roughly 4:00 or 4:30 p.m. Graffeo told the Court "we spent the whole working day together" and he never left the school. The computer system crashed and he called Marino.

Mr. Graffeo testified that he may have left Marino alone for approximately twenty minutes while he went out to get something to eat. He also informed the Court that he had other responsibilities in the building and left Marino alone in his office for another twenty minutes, roughly, while he checked on other people in the building. Thus, Mr. Graffeo conceded that he was not with the defendant at every moment during the day. Mr. Graffeo also stated that he was certain Marino never left the building between 9:00 a.m. and 4:00 p.m. Mr. Graffeo further testified that Marino fixed the computer systems, and that the

two men left the building together between 4:00 and 4:30 p.m. (Trt. at 14–16.) [2]

Graffeo further stated that as of December 8, 2000, the school could no longer do business with Marino because someone called his superior and advised him that Marino had an extensive criminal record and had a pending case in Federal Court. Graffeo then was obliged to fire him.

On cross-examination, Graffeo testified that on February 26, 2000, Marino spent the entire day at the school and received no compensation for his efforts., Also, strangely, Graffeo paid the defendant for his computer services with his own personal check and was reimbursed by the Board of Education. In addition, Graffeo has no recollection of another business visit by Marino on June 3, 2000, a more recent date; nor did he recall anything about another visit by the defendant on December 6, 1999. Graffeo explained that the reason he remembers the incidents of the February 26, 2000 visit is that there was an unusual occurrence, namely, a "crash" of the computers, and that he was "in a panic over being locked out of my computer system."

Under oath, Paul Marino denied sending the e-mail. He testified that on February 26, 2000, between the hours of approximately 9:00 a .m. to after 4:00 p.m., he was at the George Bryan Junior High School. In fact, he left the school with Graffeo a little after 4:00 p.,m. and arrived at his home at 4:25 or 4:30 p.m., at the latest. Marino sent Graffeo an invoice dated February 26, 2000, for the work he completed that day (Dft.Ex. J).

As the letter from the school indicates (Dft.Ex. K), it is apparent that a caller to the school gave details of the defendant's criminal record. According to Marino, among the few people who knew of such details was the Amato family, because he was in the same jail cell with Joseph Amato for almost two years.

Marino explained how someone could get access to the Monmouth Internet account from his phone without accessing his computer system:

Q Can you explain to the Court how someone can gain access to the Monmouth Internet account from your phone without accessing your computer system?

A It's pretty easy.

Q Slow.

A The phone box on the side of my house is in an area where you really can't see from the street. It's guarded by a four-foot high steel grate that you can't see through. There are garbage cans in front of it.

It's easy for someone to go there, all the neighbors are elderly people, 70's and above, open up my phone box, do whatever they want to do, do some damage to me and leave undetected.

They don't have to go through my system. They can get a Palm Pilot or something that you can buy for $150 and hook into my line and do some damage. (Trt. at 70–71.)

Marino also stated that tapping into his phone line would be quick, inexpensive, and easy.

Marino testified that he received many warning notices from Monmouth between December 30, 1999 and February 27, 2000 (see Dft. Ex. G–1). In fact, he received 81 different multiple logging warnings. On February 24, 2000, two days prior to the infamous e-mail, there were 13 attempts to get into his account but only one such attempt after February 26, 2000.

Marino also experienced trouble with his phone lines and phone bills, resulting in $1600 being re-credited to his account (see Dft. Exs. L1–L4). He provided the following explanation as to why the telephone company credited $1600:

A Because when I first noticed the long distance bill, which was, the best guess,

2. Trt. refers to the Hearing Transcript dated December 26, 2000.

was July, August of '99, it was over $400. I don't make that many long distance calls, so I called the phone company. The technician came out.

What he found was a pair of phone wires tapped into my line three poles down. I live in the middle of the block; it's all private houses. At the end of the block is an eight-family apartment complex, and that's where the wires were leading to. So he ripped the lines off, told me about it, left, and they re-credited my account.

On, I think it was September or October, I noticed the bills again, you know, high and exceptionally long, exceptionally large amount of local calls. And it was to the tune of like 2,000 local calls, which didn't make any sense. Called the phone company again. They sent the technician out, nice guy. He looked at the phone box and asked my grandmother and I to come outside.

What he found was a pair of wires 6 inches long, screwed to my phone box stripped at the ends and tucked behind the box to avoid detection. He then ripped them off, made note of it, told me to call the business office with his findings, and they would do whatever they had to do. And that resulted in another $800 worth of credits on my phone line. See Dft. Exhs. L1–L4.

(Trt. at 86–87.)

The Court also notes the following relevant testimony by Marino with regard to the subject of tapping into his phone lines:

THE COURT: Did you go out personally with this telephone company representative outside your house?

THE WITNESS: Yes.

THE COURT: Where did you go?

THE WITNESS: I went to the side of the house. He came about 20 minutes earlier, he examined the pole. I saw him go up on the ladder. He examined the side of the house.

THE COURT: Is that the same area that the—

THE WITNESS: It's in the pictures, yes.

THE COURT: That was in the photographs of what Mr. Gregory Blaha testified about?

THE WITNESS: Yes, the exact same location.

He rang my bell, requested me and my grandmother, who were both residents of the house, to come out and look at the house and offer an explanation, asked if we knew anything about it. Then when we said no, he said somebody has been tapping into your line. I'm removing it.

(Trt. at 90.)

Photographs were introduced showing the phone box on the side of the Marino house and a large steel grate that blocks visual access to it (Dft.Exs.N1–N3). The Court further notes that the Marino home is a private house in which the defendant and his grandmother live, without any tenants.

Marino also testified with regard to the Secret Service visit to his home after the e-mail had been sent. The agents arrived at 10:00 p.m. and questioned him about his computer. With his permission, they used his computer with his passwords and, "punched up" his e-mail program, went through his files, and apparently found nothing and did not confiscate any of the computer material. He advised the agents about his suspicions as to the Amatos, signed a few papers for them, and they left. With reasonable certainty, if the Secret Service agents had any reliable incriminating evidence against Marino, they would have seized the computer evidence and may have initiated a criminal proceeding against Marino, because as will later be shown, this e-mail could have been the basis for a criminal indictment based on a threat against the President of the United States.

On cross-examination, Marino again related his difficulties with the Amato family. He stated that while Guilia Amato could

not tap into the phone line, other people connected with the Amato family could do so. In fact, he testified that he gave Joseph Amato, Jr. his account access and password.

Also, on cross-examination, Marino conceded that he saw Probation Officer James and Supervising Probation Officer Washington on March 8, 2000 and did not mention to them that he was at the school 9:00 a.m. to 4:00 p.m. on February 26th. He explained that he was not looking for alibis that day.

Finally, Gregory Blaha was re-called to testify about certain problems with the Monmouth Internet and Bell Atlantic records. He also testified that "there's a high degree of certainty that Mr. Marino's account originated this e-mail," and that Marino's phone may have been used, but that Marino's computer did not originate the message at issue.

## DISCUSSION AND CONCLUSIONS

### I. *The Fundamental Standards in a Violation of Supervised Release Proceeding*

The rules in this type of proceeding are set forth in the seminal case of *United States v. Meeks*, 25 F.3d 1117 (2d Cir. 1994), as follows:

> Most of the fundamental constitutional procedural protections that are normally applicable to a criminal prosecution are not required for supervised-release proceedings as a matter of constitutional law. *See generally Gagnon v. Scarpelli*, 411 U.S. at 782, 93 S.Ct. at 1759 ("Probation revocation ... is not a stage of a criminal prosecution.") For example, the government need prove the alleged supervised-release violation only by a preponderance of the evidence, not beyond a reasonable doubt. *See, e.g.,* 18 U.S.C. § 3583(e)(3). Nor is there any constitutionally guaranteed right to counsel, *see Gagnon v. Scarpelli.* 411 U.S. at 790, 93 S.Ct. at 1763, though there is such a statutory right,

*see* 18 U.S.C. §§ 3006A(a)(1)(C), (E) (1988) (providing for appointed counsel in supervised-release and probation-revocation hearings); and there is no right to trial by jury, *see Gagnon v. Scarpelli*, 411 U.S. at 786, 93 S.Ct. at 1761. *See generally United States v. Arzate–Nunez*, 18 F.3d at 735; *United States v. Stephenson*, 928 F.2d 728, 732 (6th Cir.1991) (detailing due process protections in supervised-release revocation hearings). The above constitutional protections have been ruled inapplicable because the conduct that violates the conditions of supervised release is not viewed as a separate criminal offense. Accordingly, any enhancement of the punishment for the supervised-release violation should be viewed primarily as an enhancement of the penalties for the past acts, rather than for the subsequent acts.

In sum, given (a) that supervised release is an integral part of the punishment for the underlying offense and is essentially the same as parole, (b) *that a supervised-release violation is punishable whether or not it constitutes criminal conduct*, (c) that the violator may be punished both in a supervised-release violation proceeding and in a separate criminal prosecution without offending principles of double jeopardy, and (d) that a violation of supervised release need not be established beyond a reasonable doubt, or in a trial before a jury, or in a proceeding in which there is a constitutional entitlement to counsel, we are persuaded that any provision for punishment for a violation of supervised release is an increased punishment for the underlying offense.

■ Also, absent fundamental ambiguity or imprecision in the questioning, the truthfulness of a witness's testimony is a question of fact for the Court to determine in such a violation proceeding. *United States v. Lighte*, 782 F.2d 367 (2d Cir. 1986).

II. *Did the sending of the E-mail Letter at Issue Constitute Criminal Conduct or a Violation of Supervised Release?*

A. *Did the Sending of the E-mail Constitute a Crime?*

■ To determine whether a threat to the president is a "true threat" pursuant to 18 U.S.C. § 871, the Court must determine whether it was made "under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm upon or to take the life of the President.'" *United States v. Johnson,* 14 F.3d 766, 769 (2d Cir.1994) (citing *Roy v. United States,* 416 F.2d 874, 877–78 (9th Cir. 1969)); *United States v. Compton,* 428 F.2d 18 (2d Cir.1970), *cert. denied,* 401 U.S. 1014, 91 S.Ct. 1259, 28 L.Ed.2d 551 (1971). In addition, the statement must be made in the absence of mistake, duress, or coercion. The defendant in *Johnson* made the following statements: (1) on June 28, 1991, he told a therapist at a correctional facility that he was a Shiite Muslim and intended to kill President Bush for his role in the Gulf War, stating that the war was unnecessary and President Bush had "hurt [the defendant's] people"; and (2) on August 20, 1991, the defendant told a Secret Service agent that he was a Shiite Muslim and intended to kill President Bush because he was trying to take over the oil in the Middle East and former President Reagan because he had killed Colonel Gadhafi's son during April 15, 1996, bombing raid of Libya. The defendant was convicted of two counts of threatening to kill President Bush and one count of threatening to kill former President Reagan. The Second Circuit affirmed the judgment of conviction, holding that the district court properly excluded evidence of defendant's diminished mental capacity because 18 U.S.C. § 871 requires only a showing of general intent.

The Third Circuit wrote a lengthy opinion on this issue in *United States v. Kosma,* 951 F.2d 549 (3rd Cir.1991). In that case, the defendant wrote President Reagan several letters in which he stated, in relevant part,

Mr. Regan: You are hereby invited to PHILADELPHIA. We are going to give you a 21 Gun–Salute. 21 guns are going to put bullets thru your heart & brains. you are a Disgrace to the Air–Force. You are a Disgrace to Teddy Roosevelt. You are a Disgrace to John F. Kennedy. You a Disgrace to Nancy Reagan. You have insulted her intelligence, and dignity, and honor, and integrity, and I resent this very much.!! You are In Contempt of EVERYTHING that I represent, and standby, and believe. OFFICIALLY: you were NEVER the "president" of anything.!!

In an non-jury trial in November 1990, the district court found the defendant guilty of violating section 871 under an objective reasonable person standard for having made the above and other similar comments. The Third Circuit affirmed the judgment of conviction.

After adopting the objective reasonable person standard already used by this Circuit, the Third Circuit analyzed a number of factors to reach its conclusion that the defendant's comments were not protected political hyperbole like the comments made in *Watts v. United States,* 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (holding that 18–year old Vietnam protestor who stated, "If they ever make me carry a rifle, the first man I want to get in my sights is LBJ," did not violate § 871, because the comment constituted political hyperbole protected by the First Amendment). These factors are helpful to this Court in determining whether the e-mail statement was a "true threat." Specifically, the Third Circuit noted: (a) the letters were sent directly to the president; (b) the content of the letters was of questionable interest in political advocacy; (c) the defendant specified a time, date, and place for the 21–gun salute; (d) it is doubtful that the person who opened the letter

in the White House mailroom laughed at its contents; (e) the letter did not deal with matters of public concern because it was not made in the context of a conversation about public policy; (f) the letter was nothing more than a series of incoherent rantings; (g) the letters were not sent to a third party but to the President himself; and (h) any marginal political value in the letters was outweighed by the compelling national interest in protecting the chief executive.

Also helpful to this Court's analysis is the Third Circuit's string cite of cases in which various courts have found that defendant's threats were unprotected expression. *See United States v. Smith,* 928 F.2d 740, 744 (6th Cir.1991) ("Some one ought to Take [the President] OUT AS IN 'Death.' ")' *United States v. Manning,* 923 F.2d 83, 84 (8th Cir.1991) ("You can't keep me from killing George Bush; One day I will have my chance, just watch and see."); *United States v. Mitchell,* 812 F.2d 1250, 1252 (9th Cir.1987) (threatening remarks interspersed with claims that defendant was Gandhi and had a guerilla army in the Philippines); *United States v. Crews,* 781 F.2d 826, 829 (10th Cir.1986) ("If Reagan came to Sheridan [Wyoming], I would shoot him."); *United States v.. Merrill,* 746 F.2d 458, 461 (9th Cir.1984) (letters contained bloody depictions of Reagan's head with the words "Kill Reagan"); *United States v. Welch,* 745 F.2d 614, 616 (10th Cir.1984) ("If Reagan was here, I would shoot him. I wouldn't make the same mistake as Hinckley did."); *United States v. Howell,* 719 F.2d 1258, 1260 (5th Cir. 1983) ("It's too bad that John Hinckley did not get him. I will kill the President if I get a chance."); *United States v. Frederickson,* 601 F.2d 1358, 1362 (8th Cir.1979) ("I am going to blow them all up.... I start with the President and go down."). In all of the above cases, the statements were made to third parties, not to the president himself.

Addressing the question that the defendant's statements were ludicrous, made in jest, and may appear to demonstrate nothing more than the fact that he was insane, the Third Circuit remarked, " 'Although it is true that a series of bizarre remarks may tend to lower a person's credibility, potential assassins may well be irrational. Hence, to dismiss threats merely because a person expresses himself in an outlandish, illogical manner may defeat section 871's purpose of apprehending people who potentially pose a threat to the President.' " *Kosma,* 951 F.2d at 553 (quoting *United States v. Mitchell,* 812 F.2d 1250, 1256 (9th Cir.1987)).

Because the test requires the Court to examine the circumstances of the allegedly threatening comment, the relevant factors are: (1) who received the e-mail and what their reaction to it was; (2) if the person who received it was connected with the Mayor's Office; (3) whether that person notified the Mayor's protective service or the NYPD; (4) whether anyone notified the Secret Service; and (5) whether Marino, the alleged suspect, was quickly either apprehended or questioned after the threat was received.

■ Reviewing the evidence in this case, the Court concludes that the e-mail at issue may very well constitute a crime in violation of 18 U.S.C. § 871. It was sent to Mayor Giuliani with the knowledge that, with reasonable certainty, it would be forwarded to the United States Secret Service. The writer threatened to kill Mayor Giuliani with a pistol and to kill President Clinton. The writer hated and wanted both dead; mentioned the President's wife as a neighbor; wished they would die; stated that he would see "Rudy" in hell; again mentioned that both should die; and threatened to launch a rocket into President Clinton's bedroom in his new home (presumably in Chappaqua, New York). In addition, the writer stated that he had the money to arrange these things and had the nerve (or courage) to do so. Finally, the writer said that he had nothing to live for and presumably meant that he could do

these horrific acts without thought of his own safety.

### B. Would the Sending of the E-mail Constitute a Violation of Supervised Release?

Obviously, if the act constituted a federal crime it would concomitantly constitute a violation of supervised release. However, even if the sending of the e-mail did not rise to the level of a criminal threat to the President of the United States, it would certainly constitute a violation of some conditions of supervised release and would be punishable even if it did not constitute such criminal conduct. (*See United States v. Meeks, supra* at 1123).

### III. The Court's Determinations

■ After reviewing the evidence, the Court finds that the Government failed to prove, by a preponderance of the evidence, that the defendant Paul Marino sent, or directed the sending, or had anything to do with the sending of the e-mail letter at issue.

First, the Court accepts the premise established by expert witness Gregory Blaha, that the Marino phone lines could be tapped at the exterior wall and the e-mail message sent by such an interloper. This is not refuted by the Government, who called no expert to contradict such testimony.

Second, the Court credits the testimony of Michael Graffeo, who stated unequivocally, that Paul Marino was at George Bryan Junior High School on Saturday, February 26, 2000 from approximately 9:00 a.m. to approximately 4:00 p.m. The e-mail was probably sent between 3:50 and 3:55 p.m. from a phone line at the Marino house. Graffeo was apparently an impartial disinterested witness and would have no motive to falsify his testimony.

Third, the telephone company records reveal that there may have been tapping of the Marino phone line.

Fourth, the Court credits the testimony of Paul Marino. In doing so, the Court notes the active animosity and feuding between Marino and the Amato families. The Court recalls that the Amato witnesses testified before this Court in the prior violation of supervised release proceeding with actual venom and hatred against Marino. They started a criminal proceeding against the defendant. As I recall, at least one of the Amato witnesses testified falsely against Marino. The Amatos and Marino initiated criminal proceedings against each other in state courts. However, the Court finds that Marino, at least in this proceeding, is credible, and that he did not have anything to do with the sending of this vicious e-mail.

Fifth, and perhaps equally persuasive, common sense and logic impels the conclusion that someone else sent the e-mail. With his sophisticated knowledge of computers and e-mails and the like, would Marino, on supervised release, send an incriminating message on his own phone line knowing it would be so identified? Again, applying common sense, if someone from the Amato clan chose to tap into the exterior Marino phone line and sign the name Giulia Amato, they would know it would put the blame on Marino, because, logically, Giulia Amato would never be foolish enough to sign a letter such as this in her own name. And who else would want to incriminate Giulia Amato? Who is involved in a running feud with the Amato family? And on whose phone line was the message sent? This may have been a sophisticated and devious attempt to incriminate the hated individual who is now involved with Joseph Amato's former wife.

The Violation of Supervised Release report, dated June 8, 2000, contains one charge against the releasee, Paul Marino, namely "New Criminal Conduct: Threats against the President." As stated above, the Court finds that the Government failed to prove that Marino was involved in such

criminal conduct, and this Violation of Supervised Release proceeding is dismissed.

**IT IS SO ORDERED.**